Berish v. Bornstein.

STEPHEN BERISH & others,[1] trustees[2] vs. STUART BORNSTEIN,
individually and as trustee,[3] & others.[4]

Barnstable. January 8, 2002. - June 28, 2002.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Condominiums*, Management, Common area. *Real Property*, Sale,
Condominium. *Warranty*. *Contract*, Warranty, Sale of real estate. *Limita-
tions, Statute of. Repose, Statute of. Negligence*, Economic loss. *Consumer
Protection Act*, Availability of remedy. *Practice, Civil*, Master: report.
*Fiduciary. Damages*, Breach of fiduciary duty, Breach of contract, Interest.

This court concluded that an implied warranty of habitability attaches to the
sale of residential condominium units by builder-vendors in the Com-
monwealth and set forth the factors a buyer has to show to establish a
breach of the implied warranty. [262-264]

This court concluded that an organization of residential condominium unit
owners may bring a claim for breach of an implied warranty of habitability
against a builder-vendor for latent defects in the common areas of a
condominium development.that implicate the habitability of the individual
units and set forth the factors an organization of unit owners has to show
to establish a breach of the implied warranty. [264-266]

In an action by trustees of a condominium unit owners' association for
negligent construction against the builder-vendor of a condominium
development, both individually and as a trustee of the association, the
judge erred in dismissing the negligence claim on the basis of the economic
loss doctrine, where it was reasonable to infer that enumerated defects and
deficiencies in the construction caused property damage beyond the defects
in the condominium units themselves, and therefore the trustees could have
demonstrated that they were entitled to relief on the negligence claims, and
where there were additional allegations of property damage that occurred
because of the construction defects, including water damage to the units.
[266-268]

In an action by trustees of a condominium unit owners' association against the
builder-vendor of the condominium development, both individually and as

[1]Anthi Tsamtsouris, Sidney Parlow, Irving Lyon, and Angelo Massa. The
trustees are also assignees of an undefined number of unit owners' claims.

[2]Of the Trust of the Cotuit Bay Condominium (unit owners' association).

[3]Of the Cotuit Bay Condominium Trust (nominee trust).

[4]Cotuit Bay Condominium, Inc. (CBC), the general contractor for construc-
tion of the Cotuit Bay Condominium; and Jamila Bornstein, Morris Bornstein,
and Paul Bornstein (Bornstein trustees) as former trustees of the unit owners'
association.

a trustee of the association, a master properly narrowed the plaintiffs' claim with regard to actions taken by the individual trustee as trustee of the unit owners' association, but not as trustee of a nominee trust, and the master's finding that the trustee's breach was a "willful default," arising from a motive of personal financial gain, supported his ultimate conclusion that the trustee was liable for the full cost of repairing and replacing the defects of which he had knowledge when he was a trustee of the unit owners' association [268-272]; further, the master properly admitted expert opinion evidence that provided a proper basis for the master's conclusion that the association had been damaged by the breaches of fiduciary duty, and properly exercised his discretion to credit testimony of contractor witnesses as to the value of their own services [272-273].

A master appointed in an action by trustees of a condominium unit owners' association against the builder-vendor of the condominium development, both individually and as a trustee of the association, correctly concluded that G. L. c. 93A was inapplicable to a private dispute between the association and a member of that association for failure to pay condominium fees. [274]

In an action by trustees of a condominium unit owners' association on a claim for breach of contract against the builder-vendor of the condominium development, both individually and as a trustee of the association, for failure to pay the trustees the proportionate share of common expenses due on the units, the trustees were entitled, based on a master's report finding that they were owed $36,223 in unit fees, to interest of twelve per cent from the date of the breach of contract, rather than the date they filed their complaint. [274-275]

CIVIL ACTION commenced in the Land Court Department on January 28, 1987.

After transfer to the Superior Court Department, a motion to dismiss was heard by *Gerald F. O'Neill, Jr.,* J., and the case was heard by him on a master's report.

The Supreme Judicial Court granted an application for direct appellate review.

*Stephen Schultz* for the plaintiffs.

*Jennifer S.D. Roberts* for the defendants.

The following submitted briefs for amici curiae:

*Benjamin Fierro, III,* for Home Builders Association of Massachusetts, Inc.

*Stephen M. Marcus, Thomas O. Moriarty, & Edmund A. Allcock* for Community Associations Institute.

CORDY, J. The plaintiff trustees of the Trust of the Cotuit Bay

Condominium (unit owners' association)[5] commenced an action against the developer of the Cotuit Bay Condominium (condominium development), Stuart Bornstein (Bornstein); the original trustees of the unit owners' association, including Jamila, Morris, and Paul Bornstein (Bornstein trustees)[6]; and the general contractor of the condominium development, Cotuit Bay Condominium, Inc. (CBC).[7,8] In their complaint, the trustees alleged, inter alia, that Bornstein breached the implied warranty of habitability by improperly constructing the condominium development, and that he and the Bornstein trustees breached various duties by failing properly to manage the unit owners' association and care for the common areas while they were original trustees.[9]

After thirteen years of litigation, judgment was entered in the Superior Court in the trustees' favor on breach of fiduciary duty and breach of contract claims. Both parties have appealed. We granted the trustees' application for direct appellate review. The principal issue we decide is whether a warranty of habitability is implied in the sale of a newly constructed condominium unit or in the transfer of newly constructed common areas to an organization of unit owners. We conclude that such a warranty is implied in both types of transactions.

1. *Factual background.* In addition to being an original trustee of the unit owners' association, Bornstein was the principal beneficiary and trustee of the Cotuit Bay Condominium Trust

---

[5]The term "unit owners' association" or "[o]rganization of unit owners" refers to the "corporation, trust or association owned by the unit owners and used by them to manage and regulate the condominium." G. L. c. 183A, § 1.

[6]Bornstein was also an original trustee of the unit owners' association.

[7]Also named as a defendant was Ronald Schmidt. He was a CBC employee and served as a trustee from October, 1981, until July, 1983. He died during the course of the proceedings, and his estate was not substituted as a party.

[8]Bornstein was the sole or majority stockholder of CBC. In addition, all of the entities that developed and built the condominium units were legal entities in which he or members of his immediate family held beneficial interests, over which he exercised exclusive control, or for which he was the sole director or officer.

[9]The specific claims brought included negligence, breach of warranty, breach of contract, breach of fiduciary duty, and violation of G. L. c. 93A.

(nominee trust),[10] which owned both the land in Mashpee on which he built the condominium development[11] and all of the condominium units until they were individually sold. Construction of the condominium development began in 1981, and as the units were completed and sold between 1981 and 1985, Bornstein amended the master deed to expand the condominium development from the thirty-two original units to a total of sixty-two units.

On October 30, 1981, the unit owners' association was created. The declaration of trust, which sets out the trustees' rights and responsibilities, conveyed "[a]ll rights and powers in and with respect to the common areas and facilities of [the condominium development]" to the trustees "to exercise, manage, administer and dispose of the same and to receive the income therefrom for the benefit of the owners of record." It also required that the trustees set and assess common expenses for the upkeep of the common areas as follows:

> "At least thirty days prior to the commencement of each fiscal year of this trust and within thirty days after the execution hereof with respect to the portion of a fiscal year then remaining, the Board of Trustees shall estimate the common expenses expected to be incurred during such fiscal year together with a reasonable provision for contingencies and reserves, and after taking into account any undistributed common profits from prior years, shall determine the assessment to be made for such fiscal year. The Trustees shall promptly render statements to the Unit Owners for their respective shares of such assessment, according to their percentages of interest in the common areas and facilities (or 25% thereof with respect to unoccupied Units owned by Declarant as above provided), and such statement shall, unless otherwise provided herein, be due and payable within thirty days after the same are rendered."

---

[10]A "nominee trust" is "[a]n arrangement for holding title to real property under which one or more persons or corporations, pursuant to a written declaration of trust, declare that they will hold any property that they acquire as trustees for the benefit of one or more undisclosed beneficiaries." Black's Law Dictionary 1072, 1517 (7th ed. 1999).

[11]On October 30, 1981, the nominee trust filed the master deed that created the condominium development.

While Bornstein was a trustee of the unit owners' association, the nominee trust owned a number of unsold units on which it should have paid $36,223 in annual assessments. It was not billed for, nor did it pay, those assessments to the unit owners' association. However, during this same period of time, CBC provided all of the landscaping and maintenance at the condominium development and paid a substantial portion of the condominium development's operating expenses, including the insurance, electric, and telephone bills. In total, CBC expended $69,293 for the benefit of the condominium development, $33,073 more than the nominee trust would have paid for the units that it owned.

Between 1982 and May, 1985, serious problems were identified in the common areas of the condominium development, including problems with the sliding doors, chimneys, skylights, decks, and roofs. None of the skylights, chimneys, or sliding doors had been installed with flashing, as required by the State building code (code), resulting in water leakage and damage to the sheet rock and other materials on the inside of the individual units. In addition, none of the outside decks was constructed in accordance with the code, causing their supporting columns to deteriorate prematurely and rot. No action was undertaken by Bornstein and the other original trustees of the unit owners' association to cure these and other problems.[12]

Pursuant to the declaration of trust, the original trustees of the unit owners' association had staggered terms that expired between 1982 and 1985.[13] As the terms of these trustees expired, the vacancies on the board of the unit owners' association were presumably filled pursuant to the provisions of the declaration of trust. Bornstein, the last remaining original trustee, completed his term as trustee in July, 1985.

2. *Procedural history.* The trustees filed their complaint in the Land Court in February, 1987, naming Bornstein as the sole

---

[12]Additional defects in the construction discovered during this period included improper bathroom ventilation, improper attic ventilation, and improper fastening of the chimneys to the roofs of the buildings.

[13]Jamila Bornstein was a trustee from October, 1981, until June, 1985. Paul Bornstein was a trustee from October, 1981, until July, 1984. Morris Bornstein was a trustee from October, 1981, until July, 1982. Schmidt was also a trustee, see note 7, *supra.*

defendant. They set forth claims for misrepresentation, failure to properly administer the unit owners' association, and failure to pay common charges for individual units that the nominee trust owned. The trustees filed an amended complaint adding a claim for violation of G. L. c. 93A, and a second amended complaint adding negligence claims against CBC and various subcontractors who had built the condominiums. In April, 1988, a judge in the Land Court ordered the case transferred to the Superior Court.

In October, 1988, the trustees filed their third amended complaint, which set forth the following claims against Bornstein:

(1) negligence, individually and as a trustee of the unit owners' association, based on his failure to exercise due care in the design and construction of the condominium (Count I);

(2) misrepresentation, individually, based on statements about the condominium that the unit owners relied on to their detriment (Count IX);

(3) breach of the implied warranty of habitability (Count X);

(4) breach of fiduciary duty, individually, for his failure to ensure that the condominium units were properly constructed, that all known deficiencies were addressed, that "all that had been represented was provided," and adequately, duly, and competently to administer the condominium (Count XI);

(5) breach of contract and violation of the Massachusetts Condominium Act, individually and as a trustee of the unit owners' association, for failure to pay the plaintiff trustees the proportionate share of common expenses due on the units (Count XII);

(6) violation of G. L. c. 93A, individually (Count XIII).

The complaint also included one count against CBC for negligence based on its failure to exercise due care in the design

and construction of the condominiums (Count II),[14] and three counts alleging breach of fiduciary duty against the Bornstein trustees (Counts XIV, XV, and XVI).[15]

a. *Ruling on the defendants' motion to dismiss.* In December, 1993, the Superior Court judge dismissed the negligence claims against Bornstein and CBC (Counts I and II),[16] holding that the complaint failed "to assert any damage other than the allegedly defectively designed and constructed condominium itself, [and that therefore] this claim is barred by the 'economic loss' doctrine." The judge explained that:

> "[T]he only damages which the plaintiffs have alleged in their complaint is the 'substantial expense' they will likely incur in correcting the alleged defects and deficiencies. This is essentially a claim for 'economic loss', as the plaintiffs have not plead[ed] any personal injury or physical damage to property separate and apart from the allegedly defective building itself."

The judge also dismissed the claim for breach of implied warranty of habitability against Bornstein (Count X) because Massachusetts did not recognize a cause of action for breach of implied warranty of habitability arising out of the purchase of a house or condominium unit.[17] Both of these pretrial rulings are before us on appeal by the trustees.

b. *The trial.* The case proceeded to trial before a master on the remaining claims, the scope of which was narrowed before and during trial to the following: misrepresentation against Bornstein (Count IX)[18]; breach of fiduciary duty against Bornstein in his capacity as trustee of the unit owners' association

---

[14]Counts III through VIII set forth claims against subcontractors for negligence.

[15]There was also one count against Ronald Schmidt for breach of fiduciary duty (Count XVII).

[16]After the judge dismissed the negligence count against CBC, the subcontractor defendants also successfully moved to dismiss the negligence claims against them. The trustees have appealed from the dismissal of all of the negligence claims.

[17]The trustees sought an interlocutory review of the dismissal of the negligence and breach of implied warranty claims, but a single justice of the Appeals Court denied the trustees' petition.

[18]On January 24, 1995, the master limited the evidence on this claim to testimony of four individual unit owners.

(Count XI)[19]; breach of contract against Bornstein based on his failure to pay his proportionate share of common expenses for condominium units that the nominee trust owned (Count XII)[20]; violation of G. L. c. 93A against Bornstein based on his failure to pay common expenses when they were due (Count XIII)[21]; and breach of fiduciary duty against the Bornstein trustees based on their actions as trustees of the unit owners' association (Counts XIV to XVI).[22]

There were forty-one days of hearings between January 3, 1994, and January 24, 1995, during which the trustees presented thirty-nine witnesses, including one rebuttal witness, and the defendants presented one witness.

c. *The master's report.* After the close of the hearings, the master issued his initial report. He ruled in favor of Bornstein on the misrepresentation claim (Count IX) because none of the individual unit owners demonstrated that they had relied on representations to their detriment. He also found in favor of Bornstein on the c. 93A claim (Count XIII), ruling c. 93A inapplicable to a private dispute between a condominium unit owners' association and a member of that association.

The master ruled in favor of the trustees on the breach of contract claim (Count XII), finding that Bornstein had breached a contract with the trust by failing to pay $36,223 in common area fees. However, he found that the trustees had suffered no damages relating to this claim because Bornstein, through CBC, had paid more than that amount for the condominium development's expenses and maintenance that the unit owners' association otherwise would have paid. Thus, based on this "offset,"

---

[19]On January 20, 1994, the master construed this claim as against Bornstein individually for his acts as a trustee of the unit owners' association. On December 20, 1994, the master further narrowed this claim to the allegations that Bornstein failed to properly maintain the condominium and administer the unit owners' association.

[20]The master narrowed the claim to this form in his December 20, 1994, ruling.

[21]The master narrowed this claim to this form in his January 20, and December 20, 1994, rulings. He ruled that the c. 93A demand letter was inadequate to form the basis of claims on behalf of individual unit owners.

[22]The master limited this claim in his December 20, 1994, ruling to the allegation that these trustees failed to properly maintain the condominium development and administer the unit owners' association.

the master concluded that Bornstein was not liable to the trustees for any damages on this claim.

He also ruled in favor of the trustees on the fiduciary duty claim (Count XI), finding that Bornstein breached his duty as a trustee of the unit owners' association by failing to repair a wide range of defects in construction and awarding $295,562.77 in damages. Finally, he ruled that the Bornstein trustees did not breach their fiduciary duty to the unit owners' association (Counts XIV to XVI).

Both parties filed objections to the master's report.

d. *Ruling on the initial report and objections.* On February 28, 1997, the Superior Court judge ruled on the parties' objections to the master's initial report. First, he considered the master's finding that the trustees did not suffer any damages as the result of Bornstein's failure to pay common area fees. Noting that this conclusion violated the ruling in *Trustees of the Prince Condominium Trust* v. *Prosser*, 412 Mass. 723, 725 (1992) (unit owners may not assert right of setoff against lawfully assessed common expenses), the judge concluded that the nominee trust owed the unit owners' association $36,233.

The judge next considered the master's ruling on the issue of Bornstein's breach of fiduciary duty. He found that, although the master had narrowed this claim before trial to a claim against Bornstein individually for his acts as a *trustee of the unit owners' association*, the master had exceeded that limitation by effectively finding Bornstein liable not only as trustee of the unit owners' association, but also as trustee of the nominee trust, and as the developer. Therefore, he remanded this claim to the master "to make findings of damages limited to Bornstein's failure to maintain, repair and replace common areas from October 1981 to July 1985 in breach of his fiduciary duty as Trustee of the [unit owners' association]" only.

Finally, the judge considered Bornstein's contention that the master erred in assessing damages by relying on the trustees' expert's testimony regarding "replacement" costs, when the only damages available to the trustees were those related to the "maintenance" and "repair" of the common areas, about which there had been no expert testimony. The judge concluded that because Bornstein could be held liable for failure to "[maintain],

repair[], and replace[]'' defects in the common areas, reliance on expert testimony about replacement costs was proper.

e. *Amended report.* On September 14, 1999, the master issued an amended report. Based on the judge's ruling that there was no right of setoff against common area maintenance fees, the master concluded (as had the judge) that Bornstein was liable to the trustees for $36,223 on their breach of contract claim. He also revised his findings regarding the Bornstein trustees, concluding that they had breached their fiduciary duty (in not collecting fees from Bornstein's nominee trust) resulting in damage to the unit owners' association and making them jointly and severally liable therefor.[23] Finally, the master revised his finding of damages resulting from Bornstein's breach of fiduciary duty as trustee of the unit owners' association, reducing them from $295,562.77 to $104,022.70. In making this reduction, the master limited the damages to the cost of repairing and replacing the decks and the flashing around sliders, skylights, and chimneys, conditions of which Bornstein had specific knowledge as trustee of the unit owners' association.

f. *Objections to the amended report.* The defendants filed objections to the master's amended report, asserting that the master's revised conclusion about the liability of the Bornstein trustees for the unit fees was erroneous and unwarranted by the evidence; and that the master's revised finding on damages relating to Bornstein's failure to repair common areas was based on an improper measure of damages, relied on evidence of repair costs that was too remote in time, and was not supported by admissible evidence.

The trustees did not file any objections to the master's amended report. On May 1, 2000, the judge denied the defendants' objections and confirmed the report without modification. Both parties have appealed.

3. *Discussion.* We first consider the issues raised by the trustees in their appeal from the judge's dismissal of the implied warranty and negligence claims. We then consider the issues

---

[23]The master decided that Jamila Bornstein was jointly and severally liable for the full amount of the unpaid fees, but that Morris Bornstein was jointly and severally liable for $9,395 and Paul Bornstein was jointly and severally liable for $29,285.

raised by the parties in their appeals from the findings in the master's reports.

a. *Breach of the implied warranty of habitability (Count X).* This case raises issues similar to those raised in *Albrecht* v. *Clifford*, 436 Mass. 706 (2002). There we held that an implied warranty of habitability attaches to the sale of new homes by builder-vendors in the Commonwealth. Here, the judge allowed Bornstein's motion to dismiss because "[u]nder the current state of the law in this Commonwealth, such a cause of action arises only in situations involving the rental of residential property, and does not extend to the purchase of a house or condominium." We now consider whether the implied warranty of habitability attaches to the sale of residential condominium units by a builder-vendor.

Ownership of a residential condominium involves a form of property ownership different from ownership of a house. "Ownership of a condominium unit is a hybrid form of interest in real estate, entitling the owner to both 'exclusive ownership and possession of his unit, G. L. c. 183A, § 4, and . . . an undivided interest [as tenant in common together with all the other unit owners] in the common areas . . . .' " *Noble* v. *Murphy*, 34 Mass. App. Ct. 452, 455-456 (1993), quoting *Kaplan* v. *Boudreaux*, 410 Mass. 435, 438 (1991).[24] "This division between individual and common rights is basic to the theory of condominium ownership." *Golub* v. *Milpo, Inc.*, 402 Mass. 397, 401-402 (1988), citing Rohan, The "Model Condominium Code" — A Blueprint for Modernizing Condominium Legislation, 78 Colum. L. Rev. 587, 587 n.3 (1978), and Schwartz, Condominium: A Hybrid Castle in the Sky, 44 B.U. L. Rev. 137, 139 (1964). "It affords an opportunity to combine the legal benefits of fee simple ownership with the economic advantages

[24]See *Golub* v. *Milpo, Inc.*, 402 Mass. 397, 400 (1988) ("The condominium is a form of property ownership in which the unit owner retains an exclusive fee interest in his individual unit in addition to an undivided interest with all other unit owners in the condominium's common areas and facilities"); *McEneaney* v. *Chestnut Hill Realty Corp.*, 38 Mass. App. Ct. 573, 577 (1995) ("Ownership of a condominium is a dual form of interest in real estate, entitling the owner both to exclusive ownership and possession of his unit and to an undivided interest together with other unit owners in the common areas").

of joint acquisition and operation of various amenities including recreational facilities, contracted caretaking, and security safeguards" (footnote omitted). *Noble* v. *Murphy, supra* at 456. In keeping with this division of property ownership, condominium unit owners cede the management and control of the common areas to the organization of unit owners, which is the only party that may bring litigation relating to the common areas of the condominium development on their behalf. G. L. c. 183A, § 10 (*b*) (4). See *Strauss* v. *Oyster River Condominium Trust,* 417 Mass. 442, 445 (1994) ("Only the trustees have the right to conduct litigation concerning 'common areas and facilities' "). The division in property ownership, however, does not mean that a condominium unit owner has "relinquish[ed] to the condominium association all actions against the developer for failure to deliver what was promised." *Cigal* v. *Leader Dev. Corp.,* 408 Mass. 212, 215 (1990). For example, "[n]othing in G. L. c. 183A divests the purchaser of a condominium unit of the right to sue in breach of contract." *Id.* ("a breach of contract claim has an 'individual character' and is the sort of action that we have ruled may be brought or settled only by an individual unit owner").

The policy reasons that led us to adopt an implied warranty of habitability in the purchase of a new home apply equally to the purchase of a new condominium unit. See *Albrecht* v. *Clifford, supra* at 710-712 (implied warranty protects purchasers from structural defects which are nearly impossible to ascertain by inspection after home is built and imposes burden of repairing latent defects on person who has opportunity to notice, avoid, or correct them during construction process). The legal differences between the purchase and ownership of a condominium unit and the purchase and ownership of a house are inconsequential when compared to the similarity of purpose underlying both transactions, i.e., the acquisition of a habitable home. We therefore decide that an implied warranty of habitability attaches to the sale of new residential condominium units by builder-vendors in the Commonwealth, just as it now applies to the sale of new houses. See *Gable* v. *Silver,* 258 So. 2d 11, 18 (Fla. Dist. Ct. App. 1972) ("implied warranties of fitness and merchantability extend to the purchase of new

condominiums in Florida from builders"); *Pontiere* v. *James Dinert, Inc.*, 426 Pa. Super. 576 (1993) (original purchasers of condominium units may bring suit for breach of implied warranty of habitability and workmanlike construction).

A claim for breach of this implied warranty may be brought by an individual unit owner who can establish that (1) he purchased a new residential condominium unit from the builder-vendor; (2) the condominium unit contained a latent defect; (3) the defect manifested itself to the purchaser only after its purchase; (4) the defect was caused by the builder's improper design, material, or workmanship; and (5) the defect created a substantial question of safety or made the condominium unit unfit for human habitation. *Albrecht* v. *Clifford, supra* at 711-712. In addition, the claim must be brought within the three-year statute of limitation and the six-year statute of repose set forth in G. L. c. 260, § 2B.[25]

Because of the distinctive ownership divisions between units and common areas that characterize condominiums, the protections afforded purchasers of newly constructed condominium units by this implied warranty against latent defects in their own units may not be adequate to ensure the habitability of those units. Therefore, we next consider whether an organization of unit owners may bring a claim for breach of an implied warranty of habitability against a vendor-builder for defects in

---

[25]On the record before this court, we are able to apply these requirements to only one individual unit owner's claim. Maurice J. Ferriter purchased his unit on July 11, 1983, and "[s]hortly thereafter he observed water damage in the sheetrock at the entry area of the unit." He sent a letter to Bornstein on November 30, 1983, complaining of water leaking from a sliding door and the ceiling, as well as water "pouring down on the front of the unit during rain storms." He filed a complaint in intervention in 1990, asserting, among other claims, breach of the implied warranty of habitability. Ferriter's claim is barred by the applicable statute of limitations. Ferriter knew that there were substantial problems with his unit by November 30, 1983, when he wrote his letter to Bornstein. Ferriter filed his complaint as an intervener in 1990, seven years later, after the six-year statute of repose set forth in G. L. c. 260, § 2B, had run. Even if Ferriter's allegations were found to relate back to the original complaint, which was filed in February, 1987, his claim would be time-barred by the three-year statute of limitations. We cannot ascertain the viability of any other unit owner's claims that may have been "assigned" to the trustees but not fully litigated below. See note 1, *supra*.

the common areas of a condominium development that implicate the habitability of the individual units.

In Massachusetts, condominium unit owners own the common areas as tenants in common in proportion to their respective undivided interests. See *Kaplan* v. *Boudreaux, supra* at 438; *Noble* v. *Murphy, supra* at 456. However, the management and control of the common areas of a condominium development is vested in the organization of unit owners, G. L. c. 183A, § 10, which is defined as "the corporation, trust or association owned by the unit owners and used by them to manage and regulate the condominium." G. L. c. 183A, § 1. The trustees or other members of the organization of unit owners may act only on behalf of all of the unit owners. *Golub* v. *Milpo, Inc., supra* at 401. Here, the organization of unit owners is a trust, and the trustees are empowered by G. L. c. 183A, § 10 (*b*) (4), to "conduct litigation and to be subject to suit as to any course of action involving the common areas and facilities."

When there are defects or other problems in the common areas, the organization of unit owners has the exclusive right to seek a remedy. G. L. c. 183A, § 10 (*b*) (4). See *Strauss* v. *Oyster River Condominium Trust, supra.* This exclusive right, combined with a unit owner's virtually nonexistent control over the common areas, may result in an incomplete remedy for unit owners against a builder whose improper design, material, or workmanship is responsible for a defect in a common area that causes units to be unhabitable or unsafe.[26] To ensure that there is a complete remedy for a breach of habitability in the sale of condominium units, we conclude that an organization of unit owners may bring a claim for breach of the implied warranty of habitability when there are latent defects in the common areas that implicate the habitability of individual units.[27]

To establish such a claim, the organization of unit owners

---

[26]Although the unit owner could sue the association of unit owners, which is "subject to suit as to any course of action involving the common areas and facilities," G. L. c. 183A, § 10 (*b*) (4), any expenses or damages incurred by the association in litigation would be "common expenses" assessed against the units and not the builder responsible for the defects.

[27]See, e.g., *Briarcliffe W. Townhouse Owners Ass'n* v. *Wiseman Constr. Co.*, 118 Ill. App. 3d 163, 169 (1983) (homeowners' association had standing to raise breach of implied warranty of habitability because it held title to com-

must demonstrate that (1) it is an organization of unit owners as defined by G. L. c. 183A, § 1; (2) the common area of the condominium development contains a latent defect; (3) the latent defect manifested itself after construction of the common areas was substantially completed[28]; (4) the defect was caused by the builder's improper design, material, or workmanship; and (5) the defect created a substantial question of safety as to one or more individual units, or made such units unfit for human habitation. In addition, the organization of unit owners must bring this claim within the three-year statute of limitation and the six-year statute of repose set forth in G. L. c. 260, § 2B, which begins to run at "the earlier of the dates of: (1) the opening of the improvement to use; or (2) substantial completion of the improvement and the taking of possession for occupancy by the owner."

We vacate the dismissal of the claim for breach of the implied warranty of habitability (Count X) and, because that claim was not tried, we remand it for further proceedings consistent with this opinion.

b. *Negligence claims (Counts I and II).* The judge dismissed the trustees' claims for negligent construction against Bornstein (Count I) and CBC (Count II) because the complaint "fails to assert any damage other than the allegedly defectively designed and constructed condominium itself, [and therefore] this claim is barred by the 'economic loss' doctrine." The judge noted that "the only damages which the plaintiffs have alleged in their complaint is the 'substantial expense' they will likely incur in

mon areas and had contractual obligation to maintain them); *Tassan* v. *United Dev. Co.*, 88 Ill. App. 3d 581, 596 (1980) (statute conferred standing on unit owners' association to assert unit owners' rights "in the common elements"); *Starfish Condominium Ass'n* v. *Yorkridge Serv. Corp.*, 295 Md. 693, 708-709 (Ct. App. 1983) (association had standing to sue for breach of implied warranty). But see *Spring Mill Townhomes Ass'n* v. *OSLA Fin. Servs., Inc.*, 124 Ill. App. 3d 774 (1983) (homeowners' association lacked standing to sue for breach of implied warranty of habitability on behalf of unit owners because it had no legally cognizable interest in litigation).

[28]Although an individual unit owner must demonstrate that the defect manifested itself only after the purchase of the unit, an organization of unit owners does not "purchase" its interest in the common areas. We therefore require that the organization of unit owners demonstrates that the defect did not manifest itself until after the construction was substantially completed, at which time the statute of limitations and statute of repose begin to run.

correcting the alleged defects and deficiencies." Therefore, the judge concluded that "[t]his is essentially a claim for 'economic loss', as the plaintiffs have not plead[ed] any personal injury or physical damage to property separate and apart from the allegedly defective building itself."

It is well settled that in testing the correctness of a dismissal for failure to state a cognizable claim, "we accept as true all of the allegations of the complaint and all reasonable inferences which may be drawn from the complaint and which are favorable to the party whose claims have been dismissed. . . . Further, a motion to dismiss a complaint on such grounds should not be allowed unless it appears certain that the complaining party is not entitled to relief under any state of facts which could be proved in support of his claim." *Spinner* v. *Nutt*, 417 Mass. 549, 550 (1994), quoting *Logotheti* v. *Gordon*, 414 Mass. 308, 310-311 (1993). See *Eyal* v. *Helen Broadcasting Corp.*, 411 Mass. 426, 429 (1991), and cases cited. Here, we examine the complaint to determine whether the motion judge properly applied the economic loss doctrine to the negligence claims, and if so, whether the complaint, liberally construed, alleged any damages that are not barred by that doctrine.

In the absence of personal injury or physical damage to property, the negligent supplier of a defective product is not ordinarily liable in tort for simple economic loss. *FMR Corp.* v. *Boston Edison Co.*, 415 Mass. 393, 395 (1993) ("purely economic losses are unrecoverable in tort and strict liability actions in the absence of personal injury or property damage"). *McDonough* v. *Whalen*, 365 Mass. 506, 513 (1974). Economic loss includes "damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits without any claim of personal injury or damage to other property." *Marcil* v. *John Deere Indus. Equip. Co.*, 9 Mass. App. Ct. 625, 630 n.3 (1980), quoting *Alfred N. Koplin & Co.* v. *Chrysler Corp.*, 49 Ill. App. 3d 194, 199 (1977). The economic loss doctrine applies not only to the purchase and sale of products but also to claims of negligent design and installation in a newly constructed home. *McDonough* v. *Whalen, supra* at 514 (doctrine did not apply when defectively designed septic system overflowed causing personal injury and damage to

other property). See *Calloway* v. *Reno*, 993 P.2d 1259, 1266 (Nev. 2000) ("damages sought, in tort, for economic losses from a defective building are just as offensive to tort law as damages sought for economic losses stemming from a defective product").

The motion judge's dismissal of the negligence claim on the basis of the economic loss doctrine was error because his conclusion that the complaint did not allege damages beyond what that doctrine prohibits was based on an overly restrictive construction of the allegations in the complaint. The complaint alleges that the defects and deficiencies in the condominium development included poor construction of retaining walls, improper installation of skylights and sliding glass doors, improper construction of foundations, failure to install adequate flashing on the roofs, and failure to vent bathroom exhaust fans and attics to the outside. Accepting these allegations as true, it is reasonable to infer that the enumerated "defects and deficiencies" caused property damage beyond the defects in the condominium units themselves, and, therefore, that the trustees could have demonstrated that they were entitled to relief on their negligence claims. *Spinner* v. *Nutt, supra* at 550. In addition, the c. 93A demand letters, which were attached to the complaint and "made a part" of the c. 93A claim, contained specific allegations of property damage that occurred because of the construction defects, including water damage to the units. We therefore vacate the dismissal of the negligence claims (Counts I and II).

c. *The master's report.* We next turn to the appeals from the master's amended report. A master is a person "appointed by the court to hear evidence in connection with any action and report facts." Mass. R. Civ. P. 53 (a), as appearing in 386 Mass. 1237 (1982). The parties agreed in a joint motion that "[t]he hearing on the merits shall be on a facts final basis." We accept the master's subsidiary findings of fact unless they are clearly erroneous. Mass. R. Civ. P. 53 (h) (1), appearing in 386 Mass. 1237 (1982). *Pollock* v. *Marshall*, 391 Mass. 543, 554 & n.9 (1984), citing *Chase* v. *Pevear*, 383 Mass. 350, 359 (1981). To the extent that the master's ultimate findings are conclusions of law, they are subject to independent judicial review. *Lucey* v.

*Hero Int'l Corp.*, 361 Mass. 569, 571 (1972). "We must apply our own view of the law, and we must consider whether the master's general findings, on a correct view of the law, are consistent with his subsidiary findings." *Chase* v. *Pevear, supra* at 359-360.

d. *Breach of fiduciary duty (Count XI).* The master ruled that the complaint stated a claim for breach of fiduciary duty "against Stuart Bornstein individually . . . with regards to actions that he undertook while a trustee of the [unit owners' association]," but not as trustee of the nominee trust. The trustees objected to this ruling. That objection is before us on appeal.

Under the Massachusetts practice of notice pleading, "there is no requirement that a complaint state the correct substantive theory of the case." *Gallant* v. *Worcester*, 383 Mass. 707, 709 (1981). See *Charbonnier* v. *Amico*, 367 Mass. 146, 152-153 (1975); *Ahern* v. *Warner*, 16 Mass. App. Ct. 223, 226 n.2 (1983). A complaint must, however, contain "a short and plain statement of the claim," Mass. R. Civ. P. 8 (a) (1), 365 Mass. 749 (1974), which affords fair notice to the defendant of the basis and nature of the action against him. *Clark* v. *Greenhalge*, 411 Mass. 410, 413 n.6 (1991); *Ciccone* v. *Smith*, 3 Mass. App. Ct. 733, 734 (1975). Here, the breach of fiduciary duty claim sets forth allegations against "Bornstein," whereas other counts in the complaint identify "Bornstein, individually and as Trustee of the [nominee trust]." Applying our own view of the law, *Lucey* v. *Hero Int'l Corp., supra,* we conclude that the complaint did not afford fair notice that the trustees were asserting this claim against Bornstein in his capacity as trustee of the nominee trust. Indeed, any fiduciary duties that Bornstein owed to the unit owners' association, were owed in his capacity as trustee of that assocation and not as trustee of the nominee trust.[29] We therefore conclude that the master properly narrowed this claim as against Bornstein as trustee of the unit owners' association.

Bornstein appeals from the damages award in the master's

---

[29]As a trustee of the unit owners' association, Bornstein owed a fiduciary duty to the association and not to any individual unit owner. See *Office One, Inc.* v. *Lopez, ante* 113, 125 (2002).

amended report,[30] contending that it is flawed in three ways: (1) it uses an improper measure of damages for the breach of a trustee's duty to repair; (2) it relies on evidence of repair costs that was too remote in time; and (3) it is not supported by admissible evidence. We reject these contentions.

As to the proper measure of damages, the declaration of trust imposed on the trustees the obligation to "provide for the necessary work of maintenance, repair and replacement of the common areas and facilities and payments therefor." The master concluded that Bornstein breached this obligation by failing to undertake the necessary repairs, and assessed the amount of damages as "the fair and reasonable value of the labor and materials" to replace the defective decks, to install flashing, to repair the sliding doors, and to repair the chimneys and skylights. Bornstein contends that the measure of damages should not have been the cost of repairs but rather the difference between the fair and reasonable value of the repairs if undertaken now, and their value if undertaken when Bornstein was a trustee. As to what that difference might be, Bornstein claims that the plaintiffs have offered no evidence.

When a breach of trust occurs, the beneficiary of the trust is "entitled to be put in the position he would have been in if no breach of fiduciary duty had been committed." *Fine* v. *Cohen*, 35 Mass. App. Ct. 610, 616 (1993). Cf. Restatement (Third) of Trusts § 205(b) (1990) (trustee who commits breach of trust is "chargeable with the amount required to restore the values of the trust estate and trust distributions to what they would have been if the trust had been properly administered). Thus, a trustee who breaches his fiduciary duty to "maintain, repair, and replace" common areas is liable for the cost of returning the unit owners' association to the position that it would have been

---

[30]The Bornstein trustees have raised additional issues on appeal. First, they assert that the master violated the judge's February 28, 1997, order by revisiting his findings associated with the breach of fiduciary claims (Counts XIV to XVI) against Jamila, Paul, and Morris Bornstein as trustees for failing to collect common area charges from the nominee trust. The judge had rejected this objection because "[t]he master was not forbidden to clarify or to supplement his earlier findings if . . . he observed that his earlier findings may have been confusing and possibly been misunderstood by the court." *Gardner* v. *Peabody*, 23 Mass. App. Ct. 168, 173 (1986). We agree and find no error.

in had such steps been undertaken. In circumstances such as those present here, where the cost of repair and replacement, if undertaken, would have been assessed against the unit owners association as "common expenses,"[31] the liability of a trustee (if any) would be limited to additional costs incurred as a result of the delayed undertaking of those tasks. In this respect, Bornstein is correct as to the proper measure of damages in the ordinary case.

That does not lead us to conclude in this case, however, that the measure of damages found by the master and approved by the trial judge, on a correct reading of the law, was erroneous. The master found that Bornstein not only breached his fiduciary duty, but that such breach was a "willful default," arising from a motive of personal financial gain. See *New England Trust Co. v. Paine*, 317 Mass. 542, 549 (1945). Accordingly, he concluded that the exculpatory clause in the declaration of trust did not relieve Bornstein of personal liability to the unit owners' association.[32] A finding of wilful default has consequences not only as to whether personal liability attaches, but also as to the proper measure of damages. Those consequences support the master's ultimate conclusion that Bornstein was liable for the full cost of repairing and replacing the defects of which he had knowledge when he was a trustee of the unit owners' association.

The measure of recovery for a wilful breach of fiduciary duty that results in personal financial gain to the trustee may include disgorgement of the amount of the gain. See Restatement (Third) of Trusts, *supra* at § 205 ("the trustee is subject to such liability as necessary to prevent the trustee from benefiting personally from the breach of trust"). Cf. *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 556 (1997) ("Where a corporate fiduciary obtains a gain or advantage through a violation of his duty of loyalty, a court may properly order restitution of the gain, so as to deny any profit to the wrongdoer and prevent his unjust enrichment"); *New England Trust Co.* v. *Paine, supra* at

[31]The declaration of trust states that the unit owners are liable for common expenses in proportion to their respective percentage of ownership interest.

[32]The declaration of trust states that no trustee shall be liable "by reason of any action taken, suffered or omitted in good faith," or by reason of "anything except his own personal and willful malfeasance and defaults."

550 (breach of trust committed in bad faith, intentionally, or with reckless indifference to beneficiary's interest results in liability based on profit derived from breach of trust).

The master's factual findings support a broad measure of damages in this case. The master found that the repairs and replacements were necessitated by construction defects of which Bornstein was aware. The cost of correcting those defects should have been incurred by Bornstein before the units ever became part of the condominium development. By failing to make those repairs at that time, Bornstein transferred their cost to the unit owners' association, and incurred a personal gain at its expense. Bornstein further secured his gain by failing to make the repairs while he was trustee and owned many of the units against which a substantial share of the cost of those repairs would have been assessed. In these circumstances, the master's award of the total cost of repair or replacement of the defects as the proper measure of damages is consistent with a correct application of the law to his factual findings.

With respect to remoteness, if the evidence has some probative value, the better course is to admit the evidence and leave its weight to the factfinder. *DeJesus* v. *Yogel*, 404 Mass. 44, 47 (1989), and cases cited. Consequently, "[t]he exclusion on the ground of remoteness of relevant evidence has generally not been sustained." *Id.*, citing *Crowe* v. *Ward*, 363 Mass. 85, 88-89 (1973) ("We are influenced by the general view that relevant evidence should be admitted unless there is a quite satisfactory reason for excluding it"); *Kramer* v. *John Hancock Mut. Life Ins. Co.*, 336 Mass. 465, 468 (1957) (relationship of excluded evidence to issue in case would not have been "mere conjecture" and should have been admitted). We also acknowledge that "[t]he cases have recognized a range of discretion in the judge." *DeJesus* v. *Yogel, supra,* citing *Crowe* v. *Ward, supra.*

Testimony from witnesses that, in 1985 and after, they observed that there was no flashing installed around windows and skylights, that the chimneys were not securely fastened, that there was inadequate attic ventilation, and that the decks were rotting, had "some probative value" to demonstrate that Bornstein and the Bornstein trustees failed to effectuate the necessary repairs to the condominium development in breach of

their fiduciary obligations. Although contemporaneous observations might have been more probative, on the facts of this case we conclude that "the master's general findings, on a correct view of the law, are consistent with his subsidiary findings." *Chase* v. *Pevear*, 383 Mass. 350, 359-360 (1981).

Finally, with respect to the admissibility of the evidence supporting the damages award, Bornstein asserts that the master improperly denied his motion to strike evidence relating to damages because (1) the trustees' expert failed to establish the violation of any legally cognizable standards; and (2) the contractor witnesses were not qualified as expert witnesses and there was no expert testimony that the repair work that the contractors performed was reasonably necessary. The record demonstrates that the trustees' expert testified that certain aspects of the construction of the condominium development were inadequate, and violated the code and commonly accepted standards of construction and architecture. Although violations of a statute or regulations do not constitute negligence per se, they may provide evidence of negligence. See *MacDonald* v. *Ortho Pharm. Corp.*, 394 Mass. 131, 139-140, cert. denied, 474 U.S. 920 (1985). Thus, the expert's testimony provided a proper basis for the master's conclusion that the unit owners' association had been damaged by the breaches of fiduciary duty.

The record also demonstrates that the contractor witnesses who performed repairs to the condominium development testified to the actual cost of the repairs, as well as their opinion that the cost of the repairs was fair and reasonable. A person may testify as to the value of his own services. See *Cushman* v. *Boston, Worcester & N.Y. St. Ry.*, 319 Mass. 177, 180 (1946) (plaintiff teacher properly testified to value of her services and prevailing rate of wages paid to those performing similar work). Expert testimony is not necessary to establish the fair value of services that a person has rendered. See *Mason* v. *Black*, 341 Mass. 347, 349 (1960) ("The services [acting as nurse and companion] were such that their value could be found by the judge without the aid of expert testimony"). Bornstein chose not to present evidence as to the value of the services, and the master exercised his discretion to credit the uncontradicted testimony as to their value.

e. *General Laws c. 93A (Count XIII)*. The master correctly ruled that G. L. c. 93A is inapplicable to a private dispute between a condominium unit owners' association and a member of that association for failure to pay condominium fees. See *Office One, Inc.* v. *Lopez, ante* 113, 125 (2002).

f. *Breach of contract (Count XII)*. Based on the master's amended report finding that Bornstein owed $36,223 in unit fees, the judge awarded the trustees interest of twelve per cent from January 28, 1987, on that portion of the award.[33] The trustees have appealed, asserting that they are entitled to interest from the date of the breach of contract, rather than the date they filed their complaint. We agree.

General Laws c. 231, § 6C, states:

> "In all actions based on contractual obligations, upon a verdict, finding or order for judgment for pecuniary damages, interest shall be added by the clerk of the court to the amount of damages, at the contract rate, if established, or at the rate of twelve per cent per annum, from the date of the breach or demand. If the date of the breach or demand is not established, interest shall be added by the clerk of court, at such contractual rate, or at the rate of twelve per cent per annum from the date of the commencement of the action."

"Establishing the date of breach or demand is a determination for the trier of fact, and, where trial has proceeded before a jury, neither the judge nor an appellate court can make such a determination." *Deerskin Trading Post, Inc.* v. *Spencer Press, Inc.*, 398 Mass. 118, 125 (1986).

Here, the master ruled that Bornstein breached his contractual obligation set forth in the declaration of trust to issue statements to the nominee trust for the share of common expenses that it owed for the units that it owned. The master considered and rejected Bornstein's argument that, because the unit owners' association never issued any statements to the nominee trust, the mechanism to trigger a breach of the obligation to pay was not activated. However, the master decided that Bornstein and the

---

[33]There is a discrepancy in the record as to whether the original Land Court complaint was filed in January or February.

other original trustees controlled this mechanism, and therefore "it would be fallacious to conclude that the precondition to a breach never had occurred." He concluded that "Bornstein's failure to render statements to his Nominee Trust was the equivalent of his having rendered such statements and then having failed to pay."

Based on this finding, the trustees are entitled to interest from the date of breach.

4. *Conclusion.*

In light of our holding that Massachusetts recognizes a claim for breach of the implied warranty of habitability (Count X), both as to condominium unit owners and organizations of unit owners, and that the motion judge erred in dismissing the trustees' negligence claims (Counts I and II), we vacate the judgments of dismissal and remand those claims for further proceedings consistent with this opinion. We also remand the breach of contract claim (Count XII) for the calculation of the interest owed to the trustees. We affirm the judgment adopting the master's amended report as to the breach of fiduciary claims (Counts XI, XIV to XVI), violation of G. L. c. 93A (Count XIII), and breach of contract claim (Count XII).

*So ordered.*