Tochka, J.
On October 21, 2003, Plaintiff, Milan Kosanovich (Kosanovich), entered into a Purchase and Sale Agreement with the Defendant, 80 Worcester Street Association, LLC (“WSA”), to purchase a newly renovated condominium at 80 Worcester Street, Boston Massachusetts. For the following reasons, we affirm.
1. Background
Defendant, Jeffrey Feuerman (Feuerman), WSA’s manager and sole member, signed the Purchase and Sale Agreement on behalf of WSA.
An addendum to the Purchase and Sale Agreement (Addendum) listed tasks that needed to be completed before the scheduled closing date. These items included, among other tasks, painting, masonry repairs, and installation of missing lights. The Addendum stated that if any tasks were not completed by closing, suitable escrow funds would be established.
On December 18, 2003, Kosanovich and Feuerman completed a final walk through of the condominium. The escrow agreement was executed acknowledging that tasks remained to be completed, and set aside a fund of $1000. It was agreed that the tasks would be completed by January 31, 2004. If the tasks were not completed, $500 from the escrow fund would be released to Kosanovich and, per the agreement, the “seller shall be discharged and released of all obligations. ... “ However, an agreement, titled “Final Walk-Thru 12/18/03,” was attached to the Escrow Agreement. It listed seven, numbered, tasks that seller agreed to complete and provided the date for completion. Line numbered eight contained the following: “seller will return to the property to repair any damage or installation issues due to settlement or other problems not caused by the Buyer for up to a year after closing. ...” Kosanovich and Feuerman, as manager for WSA signed the agreements and the parties closed on December 18, 2003.
During the following year, Kosanovich identified a number of alleged flaws with the condominium, including missing doorstops, a leaky roof, incorrectly installed *94 skylights, and cracks in the interior wall and stairway. Kosanovich further claimed that other tasks in the Escrow Agreement remained unfinished. He repeatedly contacted Feuerman regarding these matters by phone, and by email. Feuerman responded to some but not all of Kosanovich’s requests.
On December 15,2006, Kosanovich brought suit against WSA, and its sole owner, Jeffrey M. Feuerman, in Boston Municipal Court. He alleged breach of contract, breach of implied warranty of habitability, and violation of Massachusetts General Law chapter 93A.
On February 23, 2010, the judge, after a jury-waived trial, found for Kosanovich on his breach of contract and breach of implied warranty of habitability claims, and awarded $9,000 in damages. The judge found for Feuerman and WSA on the 93A claim. All parties appealed the decision.
2. Standard of Review
The parties did not request the trial judge to make written findings of fact or rulings of law. However, a trial court’s decision, even without written findings of facts, necessarily imports “a finding of every fact essential to sustain it within the scope of the pleadings and supported by the evidence.” Colbert v. Hennessey, 351 Mass. 131, 134 (1966). This Court may not “reverse the [factual] findings of the judge, express or implied, unless we are satisfied that they are plainly wrong.” Id. (quoting McMahon v. Monarch Life Ins. Co., 345 Mass. 261 (1962)). When the contested evidence is the written record this Court is “in the same position to judge its weight as was the trial judge.” Id. However, the trial judge has the advantage of observing the oral testimony in person. Id. Therefore, when evaluating the oral transcript, this Court will give “all the weight the judge could justifiably give to it,” and only reverse when the factual “findings are nevertheless plainly wrong.” Id.
3. Corporate Veil
Kosanovich brought suit against WSA and its sole owner Jeffrey M. Feuerman. The trial court pierced WSA’s corporate veil and found Mr. Feuerman personally liable. Feuerman appealed the judge’s decision.
In Massachusetts, “corporate officers are personally liable for any tortious activity in which they personally participate.” Frontier Mgmt. Co., Inc. v. Balboa Ins. Co., 658 F. Supp. 987, 991 (D. Mass. 1986). Officers are “liable for their participation in unfair and deceptive practices,” including practices that violate G.L.c. 93A. Nader v. Citron, 372 Mass. 96, 103 (1977). The corporate veil may be pierced only in rare situations. Scottv. NG U.S. 1, Inc., 450 Mass. 760,767 (2008).The right to look beyond the corporate form should be “exercised only for the defeat of fraud or wrong, or the remedying of injustice.” Id. (quoting Hanson v. Bradley, 298 Mass. 371, 381 (1937)). To determine if veil piercing is justified, the court examines twelve factors.[2] The *95 result is not a simple exercise in counting.
It is undisputed that Feuerman had sole ownership and pervasive control of WSA However, pervasive control, standing alone, is insufficient to pierce the corporate veil. Scott, 450 Mass, at 768. Here, in addition to pervasive control, the judge had sufficient evidence to conclude that corporate records did not exist or were not properly kept. Feuerman testified that any documents he had were turned over to his attorney. However, the only evidence submitted by his counsel was the article of incorporation. He admitted that he ran his business “out of my house and out of my car.” He further stated he “ran the books, the bookkeeping, filed the returns and handled whatever paper work and legal work needed to get handled.” When asked about the records specifically however his responses were: “My ex-partner had papers that he disappeared. So he might have had stuff. They could have been moved.” When asked about tax records and whether he sought any records from his accountant Feuerman responded: “I don’t remember. I don’t remember what happened with them and if I asked them for any paper work they might have had or tax returns that are filed.” When asked if he kept any records, such as checkbooks, dealing with payments to any subcontractors Feuerman stated: “Not to my knowledge.” When asked if his “ex-partner” was a member of WSA or whether he had a formal partnership with him, Feuerman stated, “[N]o, it was a bit informal.” When asked whether the ex-partner received a W-2 or a 1099 for tax purposes Feuerman stated he would have received something from the accountant but was “not sure what” he would have received.
Feuerman argued that the lack of records was not surprising because of the passage of time. However, Feuerman was on notice of complaints with the unit by August 2004, and the potential for litigation by November 2004. Indeed, Feuerman testified that he did not “have a specific time frame” to keep any paper work, and could not identify when records were lost or destroyed.
The trial judge had sufficient evidence to conclude that Feuerman had pervasive control of the LLC and failed to properly maintain corporate records. While Feuerman testified to the contrary, the judge, with the advantage of observing the demeanor of the witnesses, was in the best position to determine the credibility of witnesses. Feuerman’s failure to maintain or produce records hindered the court’s ability to establish the twelve factors, including intermingling of assets, thin capitalization, and insolvency.[3] This failure could not be excused due to naivety or inexperience. Feuerman testified that he had been in the renovation business for over 20 years, and had established LLCs for 15 to 20 projects. He testified that he would “open an LLC” for each project. The remaining two units of the WSA project were sold by late 2004. As an experienced owner, Mr. Feuerman’s failure to maintain business records in light of potential litigation unjustifiably hindered the court’s ability to exercise its oversight role over WSA’s corporate affairs. Feuerman’s failure to maintain business records coupled with his sole ownership and pervasive control of WSA supported the judge’s decision to pierce the corporate veil.
*96 4. Breach of Contract
Kosanovich claimed that Feuerman and WSA breached the Addendum and Escrow Agreement by failing to perform repairs and remedy defects to the unit. Feuerman and WSA claimed they were only obligated to make the repairs that were specifically referenced in the Agreement.
A trial court’s interpretation of an unambiguous written contract constitutes a ruling of law, and is reviewed de novo. Baby Furniture Warehouse Store, Inc. v. Meubles D & F Ltee, 75 Mass. App. Ct. 27, 29 (2009). A contract is ambiguous when the “phraseology can support a reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken.” Bank v. Thermo Elemental Inc., 451 Mass. 638, 648 (2008) (internal citations omitted). A trial courts determination that a contract is ambiguous also constitutes a ruling of law that is reviewed de novo. Thermo, 451 Mass, at 648. If a contract is found to be ambiguous, extrinsic evidence may be introduced to serve as an interpretive guide. MacKenzie, 449 Mass, at 835-36.
In the instant case, Kosanovich and WSA signed an Escrow Agreement and Walk-Thru Agreement that is the basis for the disagreement. The Escrow Agreement included a punch list of agreed-upon repairs to the unit, the time limit to make the repairs, and the consequence of the seller’s default. It also contained the agreement that the seller would return to the property up to a year “to repair any damage or installation issues due to settlement or other problems not caused by the Buyer....” Feuerman claimed the remedy for failing to complete the listed repairs is contained within the Agreement. The Agreement states “if the punch-list items on the attached list are not completed by January 31,2004, then Escrow agent shall release the sum of $500 to Buyer and Seller shall be discharged and released of all obligations.... “ Kosanovich did not dispute at trial that this was the remedy related to the punch list of unfinished but agreed to repairs. His dispute was that WSA agreed to “repair any damage or installation issues,” beyond the punch list, that arose “due to settlement issues not caused by the Buyer....”
The difficulty with Feuerman’s position that Kosanovich’s sole remedy was $500 in damages is two-fold. A reading of the Escrow Agreement to release Defendants of all obligations after January 2004 would be inconsistent with the year-long obligation of the same agreement. In other words, Feuerman’s interpretation would require the court to find that on the same day that the parties agreed to the seller’s duty to repair for up to a year, the parties also agreed to limit this same duty to less than 2 months. This reading would essentially render Feuerman and WSA’s year-long duty meaningless, and would contradict the common sense notion that “no part of the contract is to be disregarded.” Starr v. Fordham, 420 Mass. 178, 190 (1995). Secondly, Feuerman’s and WSA’s interpretation would contradict common sense since the $500 would release them within two months from as yet unknown damages or installation issues that might occur within one year from the closing date that were due to “settlement or other problems not caused by the buyer.”
Based on the contraeds ambiguity, this Court examines the extrinsic evidence to determine the parties’ intent. The attorney that represented Kosanovich’s attorney at the closing testified that it was his belief that the $500 damage clause of the Escrow Agreement only released WSA from the first seven obligations on the punch list and that line eight was “a form of the one year builder’s warranty.” He stated that since Kosanovich’s “unit was the first one sold, construction and repairs may be *97 needed for the common area, and typical issues, including settlement issues, may-surface and require repair.” The purpose of this “catch-all clause” according to the witness was designed to assure that the seller would return to make the necessary repairs.
A contract should “be construed to give a reasonable effect to each of its provisions.” McMahon v. Monarch Life Ins. Co., 345 Mass. 261, 264 (1962). It should “give it effect as a rational business instrument and in a manner which will carry out the intention of the parties.” Id. (internal citation omitted). Based on the preference to give each provision of the contract a reasonable meaning, along with the testimony of Kosanovich’s closing attorney, the judge could have concluded that the Escrow Agreement’s $500 release applied only to enumerated tasks in the punch list that could be reasonably completed in the less than two months between closing and January 31, 2004. In agreeing to fix “any damages or installation issues” that might go undiscovered for up to one year the $500 release was not applicable.
The judge was correct to conclude that because WSA and Feuerman failed to repair damages and correct installation issues despite Kosanovich’s repeated phone calls, emails and letter before the one year deadline, they were liable for damages resulting from that breach.
5. Implied Warranty of Habitability
Kosanovich claimed that because the newly renovated condominium contained latent defects, WSA and Feuerman breached an implied warranty of habitability. WSA and Feuerman claimed that 1) the defects were not latent; 2) immaterial to safety or habitability; and 3) not caused by improper design, material or workmanship. The judge found for Kosanovich, and Feuerman and WSA appealed.
To establish a breach, Kosanovich was required to prove that “(1) he purchased a new residential condominium unit from the builder-vendor; (2) the condominium unit contained a latent defect; (3) the defect manifested itself to the purchaser only after its purchase; (4) the defect was caused by the builder’s improper design, material, or workmanship; and (5) the defect created a substantial question of safety or made the condominium unit unfit for human habitation.” Berish v. Bornstein, 437 Mass. 252, 264 (2002).
The Supreme Judicial Court in Bornstein extended the implied warranty of habitability to newly constructed condominiums. Kosanovich claimed that the purchase of a newly renovated condominium unit should be afforded the same protection. In Massachusetts, the implied warranty of habitability was originally applied to protect renters, and likely did not require the owner be the original builder of the rental property. Albrecht v. Clifford, 436 Mass. 706, 710 n.8 (2002). When the Supreme Judicial Court in Bornstein extended protection to condominium purchasers, it stated that purchasers should be protected from “structural defects which are nearly impossible to ascertain by inspection after home is built and imposes burden of repairing latent defects on person who has opportunity to notice, avoid, or correct them during construction process.” Bornstein, 437 Mass, at 263. While a renovator may have less opportunity to notice, avoid, or correct latent defects in the building, the renovator is in a better position than the purchaser. Furthermore, the renovator may have introduced new latent defects during the renovation process. Finally, because the implied warranty was originally applied against building owners who did not construct the rental property, it should be applied with equal force against *98 renovators, even if the renovators did not construct the original building.
Kosanovich was next required to prove that his condominium unit contained a latent defect, which manifested itself only after its purchase, was caused by Defendants’ improper design, material, or workmanship, and created a substantial question of safety or habitability. The existence of a breach of the implied warranty of habitability is a question of fact. Smith v. Ferreira, 83 Mass. App. Ct. 1119 (2013). The trial judge has broad discretion in “determining whether the conditions in any given rental unit amount to a material breach of the implied warranty of habitability.” Kelly v. Jones, 80 Mass. App. Ct. 476, 477-78 (2011) (citing Boston Housing Authority v. Hemingway, 363 Mass. 184, 200-01 n.16 (1973)). When there is conflicting testimony, this Court should give “deference to the trial judge’s credibility determination.” Kelly, 80 Mass. App. Ct. at 477. The trial court’s factual determination will only be disturbed if it is clearly erroneous. Id.
The parties did not request findings of fact, and the judge did not identify which of the alleged defects led to a breach of the implied warranty. The trial court must have found at least one, but not necessarily all, of Kosanovich alleged defects lead to this breach.
Kosanovich alleged defects with the doorstop and exterior walls. However, there was no evidence that these defects were located within Kosanovich’s condominium unit. An individual unit owner does not have a right to “bring a claim for breach of the implied warranty of habitability when there are latent defects in the common areas.” See Bornstein, 437 Mass, at 265. Accordingly, the trial court likely did not find a breach arising from defects in the common area.
Kosanovich also alleged defects with the drywall and stairway. However, there was no evidence at trial that the cracks in the drywall, even if latent, rendered the unit unsafe or uninhabitable. The implied warranty does not protect against “any and all defects in a home,” or impose “an obligation to deliver a perfect house.” Albrecht, 436 Mass, at 711. Thus, the trial court likely did not find a breach arising from the cracking of interior walls and stairway.
Kosanovich claimed defects with the leaking roof and improper installation of the skylight. He testified that he noticed water stains on the ceiling during the walk-thru. However, there is no evidence that Kosanovich should have known or was told what caused these stains. Testimony at trial showed that unfilled pipes, holes in the roof, and improper installation of the skylights caused the stains. The judge could have credited Kosanovich’s testimony that to discover these defects, he would have had to climb to the roof, which was not readily accessible. The trial court could further have credited Kosanovich’s testimony that because the leaky roof required him to set out pots and plastic bags to catch rainwater, the defects made the unit unsafe or unfit for human habitation. We affirm, the judge’s implied finding that defects resulting in a leaky roof breached the implied warranty of habitability.
6. Massachusetts Consumer Protection Law, G.L.c. 93A
Kosanovich claimed that Feuerman and WSA’s willful failure to make repairs violated the state’s consumer protection law’s prohibition against “immoral, unethical, oppressive or unscrupulous tactics.” Kobayashi v. Orion Ventures, Inc., 42 Mass. App. Ct. 492,505 (1997). Feuerman and WSA claimed that there was no evidence of unfair and deceptive conduct rising to a level of commercial extortion. See Anthony’s Pier Four, Inc. v. HBC Assocs., 411 Mass. 451 (1991).
*99 The “boundaries of what may qualify for consideration as a c. 93A violation is a question of law,” and is reviewed de novo. Commercial Union Ins. Co. v. Seven Provinces Ins. Co., Ltd., 217 F.3d 33, 40 (1st Cir. 2000). Not every unlawful act is automatically an unfair or deceptive one. Kobayashi, Inc., 42 Mass. App. Ct. at 505 (citing Mechanics Natl. Bank v. Killeen, 377 Mass. 100, 109 (1979)). The failure to perform obligations under a contract, “even [if] deliberate and for reasons of self-interest, does not present an occasion for invocation of c. 93A remedies.” Atkinson v. Rosenthal, 33 Mass. App. Ct. 219, 226 (1992). Only when a party’s breach “has an extortionate qualify that gives it the rancid flavor of unfairness,” does that breach give rise to a 93A violation. Id.
Here, as in Kobayashi, the existence of Feuerman and WSA’s contractual obligation to repair after January 31, 2004 is not without dispute. However, there was no evidence that WSA or Feuerman’s breach was intended to “to force [Kosanovich] into an unfavorable settlement.” See Commercial Union Ins. Co. v. Seven Provinces Ins. Co., Ltd., 217 F.3d 33, 40 (1st Cir. 2000). Additionally, there was no evidence that Feuerman and WSA’s delay was intended to “coercing [Kosanovich] to settle for substantially less compensation than the parties had agreed....” Cmty. Builders, Inc. v. Indian Motorcycle Associates, Inc., 44 Mass. App. Ct. 537, 558 (1998). Where, as here, the breach merely resulted from a dispute over contracted terms or liability, there was no 93A violation. See Anthony’s Pier, 411 Mass, at 474 (citing Pepsi-Cola Metro. Bottling Co., Inc. v. Checkers, Inc., 754 F.2d 10, 13 (1st Cir. 1985) (where liability was found when Defendant withheld payment, not because of dispute over liability, rather, as wedge to enhance bargaining power). Consequently the judge’s decision denying the 93A claim is affirmed.

 The twelve factors are: “(1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation’s funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud.” Attorney General v. M.C.K., Inc., 432 Mass. 546, 555 n.19 (2000).

 Moreover, the judge would have been warranted in concluding, based upon Feuerman’s testimony, that WSA was no longer in existence.