Connon, Richard F., J.

INTRODUCTION

The plaintiff condominium trustees (“the Trustees”) filed this action against the developer of the CotuitBay Condominiums, Stuart Bornstein (“Bornstein”), the original trustees of the unit owners’ association, and the general contractor of the development, Cotuit Bay Condominium, Inc. (“CBC”), alleging numerous construction defects. This matter is before this Court on a remand from the Supreme Judicial Court for trial of negligence and breach of warranty claims which were improperly dismissed. See Berish v. Bornstein 437 Mass. 252 (2002).

PROCEDURAL HISTORY

The relevant counts of the Trustees’ Third Amended Complaint, filed on November 15, 1988, alleged negligence by Bornstein (Count I) and CBC (Count II), misrepresentation by Bornstein (Count IX), breach of the implied warranty of habitability by Bornstein *531 (Count X), breach of fiduciary duty by Bomstein (Count XI), breach of contract by Bomstein (Count XII), violation of Chapter 93A by Bomstein (Count XIII), and breach of fiduciary duty by the other original tmstees (Counts XIV through XVII). Prior to trial, in December of 1993, this Court (O’Neill, J.) dismissed Counts I and II based on the economic loss doctrine, and dismissed Count X on the ground that Massachusetts did not recognize a cause of action for breach of implied warranty arising from the sale of a condominium. The Tmstees filed, without success, a petition in the Appeals Court seeking relief from the order of dismissal. In denying said petition, Dreben, J. wrote “that... it is suggested that any additional otherwise admissible evidence, if any, is only relevant to the dismissed counts also be admitted.” Berish v. Bornstein, Appeals Court Docket No. #94-J-35.
The remaining claims proceeded to trial before a Master between Januaiy 3, 1994 and Januaiy 24, 1995. The Master permitted evidence regarding construction defects, over the defendant’s objections, insofar as such evidence might be relevant to the remaining counts of the complaint. The Master stated, “Some of my findings . . . with regard to Counts XI, XIV, XV and XVI, are relevant to any potential revived claims for negligence.”
In an Amended Report dated September 14, 1999, the Master found in favor of Bomstein on the misrepresentation and Chapter 93A claims. The Master found in favor of the Tmstees on the breach of contract claim for failure to pay common area fees in the amount of $36,223. The Master found in favor of the Tmstees on the breach of fiduciary duty claim against Bomstein for failure to repair certain construction detects. The Master interpreted a February 28, 1997 order of this Court (O’Neill, J.) as requiring him to limit his findings of breach of fiduciary duty to defects in the common area of which Stuart Bomstein had actual notice during his tenure as a trustee of the Association Tmst. The Master found such notice of the major defect of a lack of flashing or improper flashing in areas including the sliders, skylights, outside enclosures of the chimneys, windows, and roofs. Accordingly, the Master awarded damages in the amount of $104,022.70 to repair and/or replace the outside decks in certain units,[4] the flashing around the skylights and roofs in certain units,[5] and the flashing around all the slider doors in the condominium.[6]
The Master also found defects in the bathroom exhaust venting systems, the attic venting system, and the improper fastening of certain chimneys to the building roofs, but found that Bomstein did not have notice of these defects in his capacity as a Tmstee. In an Appendix to his report entitled “Alternate Findings and Conclusions of Law — Other Common Area Defects,” the Master found that had he not been restricted by the court, he would have awarded the plaintiffs an additional $191,605.00 to repair these defects.
On appeal, the Supreme Judicial Court held that an implied warranty of habitability attaches to the sale of residential condominium units by builder-vendors. See Berish v. Bomstein, 437 Mass, at 263. In addition, the Court reversed the dismissal of the negligence claims on the ground that the Trustees might be able to prove property damage beyond the defects in the condominium units themselves. The Supreme Judicial Court remanded Counts I, II and X to this Court for trial, and this Court held hearings commencing on Januaiy 10, 2005 and concluding on April 7, 2005. Based on the credible evidence presented, and the reasonable inferences to be drawn therefrom, this Court makes the following findings of fact.

FINDINGS OF FACT

1. Windows

The first claim that the Court is to consider is the windows and the lack of window flashing. Ronald Schmidt (“Schmidt”), a project manager who was in charge of the building at Cotuit Bay Condominiums for the Defendants, was in control of selecting suppliers and supervising construction. He was at the site between 45 to 50 hours per week from the period of November 1980 through Januaiy 1986. Schmidt testified that “the windows were self-flashed,” which means that the windows came with a flashing already attached. Ralph Crossen (“Crossen”), an expert who testified on behalf of the Defendants, stated that the 1980 Building Code “allows self-flashing windows to stand alone without additional flashing.” Under Section 3607.3.8 of the State Building Regulations and Standards:
approved corrosion resistive flashing shall be provided at the top and sides of all exterior windows and door openings in such a manner as to be leak-proof, except that self-flashing windows having a continuous lap of not less than one and three-eighth inches (28 mm) over the sheeting material around the perimeter of the opening, including comers, do not require additional flashing . . .
There was never any requirement that there be flashing at the bottom of the windows, although the evidence strongly suggests that, of those windows inspected, there were gaps at the bottom corners large enough to insert a pencil. Under the building code and the standards of the industry, no flashing is required at the bottom of these windows. In addition, the evidence strongly suggests that none of the windows were caulked. Normally this would be observable by the caulk oozing from the side of the windows, which is some evidence that the caulk had been placed underneath the windows prior to their placement. The Court further finds from the evidence that there was no flashing or caulk on any of the clerestoiy windows.
*532 Burt Kaplan (“Kaplan”), the owner of Unit 24 and a trustee of Cotuit Bay from July of 1984 through July of 1986, moved in in June of 1983 and became aware that, during the winter from 1983 to 1984, extreme cold was coming from the windows in his unit. He placed a knife through the sides and came to the conclusion that there was no flashing. In order to prevent the draft, he caulked the areas on several occasions. Subsequently, the windows were replaced because of water leaks.
The records maintained by the Condominium Association were on a computer program, and Kaplan was the only one who had access to that program. On the only occasion when he accessed the information, he was only able to retrieve some but not all of the information. He was able to determine that the following units had their windows replaced: Unit 21 because of leaks, Unit 22 because of leaks, Unit 24 because of leaks, Unit 27 because of leaks, Unit 28 because it was not weather tight, Unit 30 as it was not weather tight, Unit 61 because of leaks, Unit 75 also because of leaks, Unit 77 because it was not air tight, and Unit 88 because it was not air tight. Of all of the windows at Cotuit Bay Condominiums, only 36 windows have been replaced. Kaplan assumed that if the windows of all other units were similar to his, those windows, like his, were not properly flashed, although he never conducted any destructive testing. In June of 1983, Kaplan was aware of leaks resulting from defects in the common areas of the building. In addition to the leaks he experienced in his own Unit 24, there were leaks within the building itself in common areas.
There is no documentation concerning the 36 windows that were replaced, nor any explanation as to the causes of those leaks. There is no dispute that the windows leaked in this newly-constructed condominium. When the windows were replaced, the Owners Association paid for the cost of replacement. The decision whether to replace the windows was made by Kaplan, who developed a criteria along with the Condominium Association. The Trustees are seeking reimbursement for the replaced windows; however, there are no records on the 36 windows, including the costs.
The Trustees presented an expert, Christopher Wharton (“Wharton”), with a Bachelor of Science in Marketing. Wharton testified that he had never testified in court before, and that his experience was as a window salesman in Southeastern Massachusetts from 1993 to 1998. He further testified that he was not familiar with the State Building Code and that he is currently the owner of a company which sells aluminum windows. He has personally installed thousands of windows over the years and is not familiar with the term “self-flashing,” although it is referenced in the State Building Code. Wharton was permitted to testify as to the industry standards in 1993 when he first began his career as a sales rep in Southeastern Massachusetts.
Wharton visited the Cotuit Bay Condominiums in January of 2003. His investigation involved checking nine buildings, although he cannot remember what units he checked. He examined all of the windows that had been exposed and determined that none of them had caulking. There was a nailing flange which met the head and was mitered, leaving a hole at the sill, which was not mitered. The nailing flange is an extension to an aluminum window that allows the installer to nail into the sheeting. It extends beyond the actual window dimensions, allowing one to anchor the window properly. Examination of the clerestory windows at the nine buildings Wharton viewed revealed that they all had the nailing flange mitered at all four comers. Wharton did not observe flashing, which is a secondary means to keep water and air out, nor did he observe any caulking in those areas.
Wharton admitted that there were hundreds of windows that he had not inspected and that he was unaware that the 1980 Building Code only required flashing at the top and the sides but not at the bottom.
The literature on metal windows in a coastal environment recommends that they be checked annually for caulk and seals and re-caulked where necessary. There is no evidence submitted that suggests that the unit owners or the Association undertook such a maintenance schedule.
On Page 36 of the Master’s Report filed on September 1, 1999, and in particular Finding #184, it states: “In some instances water leaks were observed shortly after purchase of the particular unit or within a few years thereafter.” In Finding #185, the sliders, skylights, outside enclosures of chimneys, windows and roofs of the Cotuit Bay Condominium were structural components of the condominium and as such were common areas. In Finding #186, the Master referred to water leaks at sliders in 25 units. Of those 25 units, Units 22, 24, 27 and 77 also had windows replaced because of water leaks. However, the Master never referred to water leaks at windows in those units.
This Court concludes from all of the evidence and in consideration of the testimony presented on behalf of the Defendants, that the windows that were installed at Cotuit Bay Condominiums were not self-flashing as there is no evidence demonstrated to the court that would lead to any other conclusion. The windows had not been caulked and in many units there were water leaks.
Had the defendants installed windows with the proper flashing and with caulking, it would keep the elements out of the building. The construction of the clerestory windows without a header flashing was also inadequate and the lack of a header flashing on said windows allowed water to infiltrate the structure at these points. There were a total of 43 windows that leaked, which included 33 clerestory windows. In addition to those 44 windows, there were 32 windows that needed to be replaced because they were leaking *533 and were not weather-tight. All of these windows had been replaced by the Defendants. In addition to those 32 windows, observations were made of moderate water damage around an additional 15 windows and five windows in Unit 6, Unit 12, Unit 60, Unit 68, Unit 82 and 88.
In order to repair the windows, it would become necessary to remove the shingles from around the windows and to remove the existing window and any rotted sheathing around the window, reframe the rotted headers or structures, caulk and re-flash and re-install the windows. This would be a labor-intensive job and would cause some inconvenience to the homeowner.
The allegation is that the Defendants installed some 429 windows without adequate flashing. Of that number, 78 were clerestory windows. The current replacement cost is $2,064.00 per window, which would include the cost of flashing and repairing water damage, if any, and also covers the cost of fixing a clerestory window. If there was in fact damage around a clerestory window, it would then become necessary to stage the roof area to check for rot and to remove drywall where there may have been evidence of water damage. The cost to perform the removal and re-installation of these windows in 1987 dollars is $885,456.00. The current cost, as testified to by the Trustees’ experts, is $1,628,531.00. The Defendants offered no expert testimony as to the fair and reasonable cost of flashing the windows and repairing the problems caused by the lack of flashing, and they have not offered any expert testimony relating to the labor hours necessary to accomplish the work. The Defendants do suggest that the only windows that should be replaced were those windows that actually leaked; the Plaintiffs are not willing to make that concession. However, the court is also not convinced by a preponderance of the evidence that the fair and reasonable cost today of flashing the windows and repairing the windows caused by inadequate flashing is $1,628,531.00. By this Court’s calculations, only 22 percent of the windows experienced some difficulty, be it water leaks or drafts, and the court would thereby make an adjustment and award damages to the Plaintiff amounting to 22 percent of $1,628,531.00, or $358,274.62.

2. Bathroom Ventilation

The Trustee’s second claim concerns the lack of adequate bathroom ventilation, and this claim relates only to the ventilation in the original bathrooms and not those that may have been added after the original construction. The court finds that the failure to vent the bathrooms in accordance with Section 512 of the 1980 Massachusetts Building Code fell below the acceptable standards of construction at the time as, under the Code, bathrooms were required to be vented by a system that was capable of producing a change of air every twelve minutes and the Code specifically prohibited the re-circulation of air.
The Trustees assert that the failure to properly vent the bathrooms resulted in a discharge of moisture into the building air, the attic, and between the joists in other rooms, which resulted in the collection of moisture and the eventual decay of wood flooring and plywood. The court does not find from any view of the evidence that the lack of proper ventilation contributed significantly to the decay of any wood flooring and plywood. This claim is somewhat speculative and has no firm foundation in the evidence.
In addition to the decay and the rot of wood materials, the Trustees claim that the lack of a proper ventilation system caused and promoted mold growth. Although this may be true, and the evidence certainly would reflect that there was a certain amount of mold growth, this Court finds that the mold growth was insignificant as it related to the health and safety of the occupants and was not the cause of any sickness by those who occupied any of the units within the condominium. The Trustees called as their expert regarding mold David Gordon (“Gordon”), who is a diplomat with the American Board of Industrial Hygiene. Gordon, by background and experience, was qualified to testify as to the existence of mold in the Cotuit Bay Condominiums. Gordon has lectured at Harvard University, as well as the University of Colorado, University of Kansas, University of Texas, and has published articles regarding controlling air pollution, et cetera.
On January 14, 2003, Gordon tested six units at Cotuit Bay Condominiums: Units 64, 67, 73, 78, 79 and 80. The selection of those units was based upon the occupants’ complaints about odors and seeing molds within the units. Air samples were run in each unit and the exhaust systems for the HVAC were tested. In addition, the exhaust systems for the bathrooms in each unit were tested. In the units tested, Gordon took surface samples as well as air samples to determine the probable mold source. In the first six units tested, there was the presence of mold. According to the American Industrial Hygiene Association, which established categories relative to the various readings of mold, if the concentration exceeds 500 colony-forming units per cubic meter, it is considered to be a possible mold source. If the concentration is in excess of 1,000 colony-forming units per cubic meter, then it is considered a probable mold source. The air taken from the basement of one of the units tested was over 5,000 colony-forming units per cubic meter, which is ten times higher than the minimum number and somewhat significant.
Gordon conducted surface testing in Unit 73, the same unit in which he had found the higher levels of colony-forming units and he came to the conclusion that the TNTC, (too numerous to count) types molds were present in three cases. Cladosporium aureobasid *534 ium, pollutants which are very odorous, were too numerous to count. There was a significant amount of Penicillium and some Stachybotrys, which is considered a toxic mold. In addition, he found yeast, which is a very common mold found in the New England area. In inspecting the six units, Gordon observed that the bathroom ventilation systems were not exhausting to the exterior of the building, but were in fact exhausted to the spaces between the ceiling of the units and the floors of the units. In the case of second-floor ventilation, it was exhausted into the attics and did not exhaust to the exterior of the building. There were strong odors in approximately five units that are called “mold odors,” a recognizable odor. Gordon concluded that the contamination level in all of the six units would be considered a probable contamination source under the guidelines previously referenced.
Gordon later tested other units; however, the samples that were taken from those units were far less than the samples during the initial six-unit inspection on Januaiy 14. In the final analysis, Gordon opined that of the 31 units that he inspected, there were significant levels of mold which indicated a probable contamination source or sources in one or two units, and that those molds were generated by vapor from the bathrooms entering into the spaces of the attics and significantly elevating the relative humidity, which was dependent upon the number of showers that were taken on a daily basis.
In order to remediate the situation, Gordon opined that insulation would have to be removed in the attic or the duct works and that the HVAC units had to be cleaned and disinfected. Where there was fiberglass duct work in those contaminated areas, that would have to be removed and replaced. The only way to prevent the molds from growing is to reduce the relative humidity, and that all water vapor must be exhausted out to the exterior of the building. Gordon testified that although the existence of a strong odor of mold affected the quality of life, it did not present a health issue. Gordon conceded that the lack of maintenance on the HVAC system could possibly cause the mold to grow inside the unit and there is no evidence before the court as to whether or not the Trustees had a routine maintenance policy with respect to that system which contained much moisture by its very nature.
When this case was first tried before a Master, the Master found that the fair and reasonable value of labor and materials to properly install the bathroom vents was $78.65 for the 58 units that were affected, for a total of $4,561.00. The damages were limited to 58 units because the expert had only visited that number of units out of the 62 units. The Trustees’ expert testified that the repair of the improper bathroom ventilation would involve the cost of removing the flooring, refinishing the floor and the walls. The costs would vary between the B units and the C units. The B units’ chases would have to be built, as the B-l units sit below the B-2 units. In order to vent the bathrooms to the outside in C units, chases would have to be built, as the bathrooms in the first floor are interior bathrooms currently vented into the ceilings and the bathroom hose will need to run through the second finished floor of the unit.
This Court finds that the Trustees have failed to prove by a preponderance of the evidence any causal relationship between the improper bathroom ventilation and the mold that was found within the units. There were only one to two units that had a probability of molds being the source and, of all of the units, there was no evidence with respect to a routine maintenance program of the HVAC unit which is a likely source and cause of most of the mold odors. Therefore, the court concludes that the Trustees have not proven their case by a preponderance of the evidence with respect to the molds and any damages that may be relating to its remediation.
3. Attic Ventilation
The Trustees assert that the installation of the attic ventilation fell below industry standards and was not done in accordance with the Fourth Edition of the State Building Code. The 1980 Massachusetts Building Code, Section 2121.1 and 507.2.4, “Attic Ventilation,” required enclosed attics and enclosed rafter spaces, formed where ceilings are applied directly to the underside of the roof rafters, to have cross ventilation for each separate space by ventilating openings sized according to Code Section 2121.1.1.
The attic ceilings, upon examination, were without vapor barriers and vented areas of at least one square foot must be provided for each 1.50 square feet of ceiling area. The ridge vent must be at least three feet above the level of the eave vent. As for the A units, the square footage of relevant ceiling areas is approximately 350 square feet, and there is no proper ventilation installed in said units. In the B-2 units, the square footage of the ceiling area is approximately 288 square feet and in Unit 80, no venting was installed. In the C units, the square footage is 275 to 340 square feet for the C-l and C-2 units respectively. In the C units, insulation was stuck between the rafters and no ridge vents were provided; in effect, there was no ventilation.
In the Master’s Report, finding number 277, the Master found that the State Building Code in effect during the period of construction required ridge venting and, where there were eave vents, baffles would be required to deflect the incoming air above the surface of the insulation. The Master also found that none of the buildings had ridge vents or baffles installed in accordance with the Building Code in effect at that time. This Court agrees with those findings.
The Trustees contend that the improper ventilation of the attics contributed to the overheating of roofs and the rotting of roof rafters. The Master found that if *535 venting in the manner specified by the Massachusetts State Building Code is not provided, any timbers, rafters, and plywood will ultimately decay. In fact, decay in the timber or the rafter area has been observed in Unit 66 in the Cotuit Bay Condominium. However, this Court saw no evidence of rotted roof rafters. The Trustees’ claim is based upon the assumption that water would find its way into the rafters, for that is the only way that the wood members, rafters, plywood and sheeting would rot under those conditions. In the absence of water, the wood members would not rot. This Court finds that the Trustees have failed to prove by a preponderance of the evidence that the improper attic ventilation caused the roof rafters to rot.
The Trustees further contend that the failure to properly vent the attics was a cause of the premature failure of the roofs which have already been replaced by the Cotuit Bay Condominium Association. This Court rej ects the argument that the replacement of the roofs for 19 C units and two B-2 units was attributable to inadequate ventilation. The evidence at trial was that the shingles that were used in the original construction were 15-year shingles, and of the 62 units that were constructed by the Defendants, three of the units required new roofs after 13 years, and 13 units required new roofs after 14 years. The Trustees’ claim for roof replacement damages is unreasonable since for the most part, the roofs lasted for approximately 15 years. The evidence before this Court is that the roofs that failed prior to 15 years were insignificantly less than the normal life span of the roof with a 15-year shingle, and that such failure could not be attributed to faulty ventilation.
Therefore, this Court finds that the Trustees have failed to prove by a preponderance of the evidence any causal relationship between the improper attic ventilation and the mold that was found within the units and the premature failure of some of the roofs.
4. Fire Walls and Fire Stops
The Trustees contend that the fire walls were defective because they were not constructed in accordance with Section 909.0 of the 1980 State Building Code entitled, “Fire Separation Walls.” With respect to side-by-side units when attached to a common wall in multiple, single-family dwellings, the Code required the common wall to be a fire separation wall with a minimum of one-hour fire resistance rating. Said wall was required to extend from the foundation to the underside of the roof sheathing (one-half inch plywood) and to the inside of the exterior wall sheathing. Under Section 909.4 of the Code, regarding continuity of fire separation walls, all hollow vertical spaces must be fire stopped at every floor level as required by the State Building Code Section 919.
Kaplan first became aware of the lack of taping and compounding when he went to the attics in 1984 and 1985. During the course of the trial, Kaplan was presented with several photographs depicting the defective conditions in Units 15, 19 and 21, all examples of no taping or compound in the sheet rock. The lack of taping and compound was plainly visible.
The Trustees first became aware of the inadequate fire walls in 1987 as a result of a report completed at that time in anticipation of the first trial. In all the units that were inspected, it was determined that the fire separation wall failed to meet the Building Code standards for a number of reasons: failure to continue the wall to the underside of the roof sheathing or roof rafter; failure to use five-eighths-inch gypsum wallboard; and failure to provide blocking of five-eighths of an inch wallboard at second-floor ceiling joists and non-pro tective penetrations. The lack of proper installation of fire separation walls creates a serious safety risk to the unit owners. The Trustees’ expert credibly opined that the walls fell below industry standards and violated the Code because there were all kinds of gaps in the fire walls both in terms of joints between the sheet rock as well as a lack of fire stopping at both the top and the bottom of the walls. These are areas that would not be plainly visible even to one who had knowledge of the requirements of the Code. Except for the inspections made by Kaplan, all other attic areas containing the fire separation walls are not easily accessible or obvious to the unsuspecting unit owner. In addition, there was no way to make a determination as to the thickness of the wallboard unless there was destructive testing.
The Trustees’ expert, Robert Brandon, testified that the failure to adequately construct the fire walls and fire stops presented a significant health and safety issue, and that the fair and reasonable cost in 1987 of bringing the fire walls up to code was approximately $67,097.00. The cost in 2005 would be $123,404.00. The cost in 2005 to install proper fire stops is $65,092.[7]

5. Chimney Fastening, Clearance and Framing

The Trustees contend that the construction of the chimneys fell below acceptable standards because the chimneys themselves weighed between four to five hundred pounds and were fastened only by nails, the studs were 24 inches apart which fell below the construction standards at the time, and the 24-inch studs were not sufficient to support the chimneys.
Two chimneys fell off during Hurricane Gloria in 1985. Kaplan went up to the roof and observed how the chimneys had been connected to the roof. He also went into the attics of some of the units and was able to see that their chimneys were connected in the same manner. In late 1985 or in 1986, Kaplan observed that the chimneys in Units 6, 9, 19, 22 and 87, all C-style units, were affixed to the roofs by two-by-fours nailed to the roof sheathing with 16-penny nails or spikes. The chimneys on Units 13, 14, 18, 19, 22, 23, 64, 67 and 75 fell off the roofs during Hurricane Bob in 1991.
*536 The Trustees’ expert, Thomas Galligan (“Galligan”), credibly testified that the attaching of the chimneys with nothing but nails into the plywood violated Section 715 of the 1980 State Building Code. Galligan further opined that Section 715.3.2 of the State Building Code, in effect at the time, required that the chimneys be designed so that no more than 67% of the resistance is provided by dead load effects. The Building Code required that chimneys be able to withstand pressures of 21 pounds per square foot. Calculations show that the dead weight of the chimneys alone plus the nails utilized by the defendants did not create sufficient resistance to those winds or the pressure of 21 pounds per square foot.
Improper fastening of the chimneys was observed either by the Trustees’ expert or others at Units 5, 6, 9, 11, 12, 19, 22, 26, 27, 30, 59, 64, 68, 70, 71, 78, 85, 86 and 87, for a total of 19 units. The reasonable and necessary repair to these chimneys is to install steel angles or a carriage bolt directly from the base of the chimney enclosure to the rafters. In addition, it would be necessary to install headers in each of the chimneys, and in some instances it would become necessary to install headers in the process of fastening external portions of the chimneys.
The Board of Trustees, by and through Kaplan, had notice of the defective chimney fastenings in 1985, making their complaint of January 28th, 1987, timely. According to Kaplan, the non-Bornstein controlled trustees first learned of the problems with chimney framing and chimney clearances in early 1987. However, these defects were not asserted in the first amended complaint filed on February 25th, 1987, the second amended complaint filed on September 22nd, 1987, or the third amended complaint filed on October 26th, 1988.

RULINGS OF LAW

I. STATUTE OF LIMITATIONS DEFENSE

Count I of the Third Amended Complaint alleges negligence on the part of Bomstein individually and as trustee of Cotuit Bay Condominium Trust and Count II alleges negligence against Cotuit Bay Condominium, Inc. Count X of the Trustees’ third amended complaint alleges breach of the implied warranty of habitability. The defendants contend that all these claims are barred by G.L.c. 260, §2B, which provides in relevant part:
Actions of tort for damages arising out of any deficiency or neglect in the design, planning, construction or general administration of an improvement to real property . . . shall be commenced only within three years next after the cause of action accrues; provided that in no event shall such actions be commenced more than six years after the earlier of the dates of (1) the opening of the improvement [building] to use; or (2) substantial completion of the improvement [building] and the taking of possession for occupancy by the owner.

A. Tolling of Statute of Limitations

Under G.L.c. 183A, §10(b)(4), only the condominium trustees have the right to conduct litigation concerning common areas and facilities. Strauss v. Oyster River Condo. Trust, 417 Mass. 442, 445 (1994); Cigal v. Leader Development Corp., 408 Mass. 212, 217 (1990) (the association acts as the exclusive representative of unit owners in litigation for negligent construction). The plaintiffs emphasize that the Board of Trustees was dominated by defendant Stuart Bornstein and his relatives until July of 1985, when unit owners became the majority of the Board,[8] and argue that a Bornstein-dominated Board would not be expected to sue for the common area defects at issue in this case. The plaintiffs therefore argue that the statute of limitations for all claims was tolled until July of 1985, relying on the “adverse domination” doctrine discussed in Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501, 522-23 (1997).
Under that doctrine, the statute of limitations in a shareholder derivative action is tolled while a corporate plaintiff is dominated by the wrongdoer, and does not begin to run until knowledge is gained by those who have the power and responsibility to act on the corporation’s behalf and are independent of the wrongdoing. Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501, 522-23 (1997). This Court is not aware of any Massachusetts appellate decision explicitly applying this doctrine in the context of a developer-dominated condominium association. See, e.g., Beaconsfield Townhouse Condo. Trust v. Zussman, 49 Mass.App.Ct. 757, 761, rev. den., 432 Mass. 1109 (2000) (using the date that the condominium trust acquired independent trustees as the starting point for a statute of limitations analysis in a case involving roof problems). Cf. Libman v. Zuckerman, 33 Mass.App.Ct. 341, 345 (1992) (because defendants failed to object to master’s report, court declined to review master’s conclusion that condominium association was estopped from raising statute of limitations in part because developers controlled the association, which made decisions concerning common areas and litigation).[9] This Court declines to rule that the statute of limitations in this case was tolled based on adverse domination, absent appellate authority for applying that doctrine in this context. Cf. Charley Toppino & Sons, Inc. v. Seawatch Marathon Condo. Assoc., Inc., 658 So.2d 922, 925 (Fla. 1994) (discussing §718.124 Fla. Stat. (1987), which provides that statute of limitations for claims by a condominium association “shall not begin to run until the unit owners have elected a majority of the members of the board of administration” in order to prevent developer from retaining control over association long enough to bar potential cause of action which unit owners might otherwise wish to pursue).[10]

B. Accrual of Claims

The Trustees’ original complaint was filed in the Land Court on January 28, 1987. A cause of action for negligent construction accrues when the plaintiff *537 knew or should have known of the existence of a defect which is attributable to the defendant’s conduct. See Albrecht v. Clifford, 436 Mass. 706, 715 (2002); White v. Peabody Constr. Co., Inc., 386 Mass. 121, 129-30 (1982). The plaintiff bears the burden of demonstrating facts showing that his claim is not barred by the statute of limitations. Albrecht v. Clifford, 436 Mass. at 715.
The defendants contend that all of the plaintiffs’ claims are time-barred because numerous individual unit owners, as well as Chairman of the Board of Trustees Stuart Bomstein, had knowledge of extensive water problems, including sliding door and skylight leaks, as early as 1983. With respect to accrual of a condominium trust’s claim, “it is the collective knowledge of the Trustees and their agents that constitutes the knowledge of the Trust for purposes of identifying when a cause of action accrues.” Harris v. McIntyre, 2000 WL 942559 at *4-5 (Mass.Super.Ct. June 27, 2000) (Gants, J.) (rejecting the argument that the knowledge of individual unit owners governs because individual owners do not have a fiduciary duly to the Trust and their ability to bring a derivative action regarding common areas is restricted). Accord Celotex Corp., Inc. v. Gracy Meadow Owners Assoc., 847 S.W.2d 384, 391 (Tex.App. 1993) (declining to impute unit owner’s knowledge of defect to homeowners’ association for purposes of the statute of limitations). Thus, the fact that individual unit owners were aware of certain defects is relevant to accrual of the statute of limitations only if they reported such defects to the Board of Trustees.
Further, there is no merit to the defendants’ argument that once the Trustees were aware of water penetration in numerous units, they knew that there were “substantial problems" with the condominium attributable to poor construction such that the statute of limitations for all defects accrued at the same time. “Notice of one type of design or construction defect does not necessarily constitute notice of all design or construction defects.” Harris v. McIntyre, 2000 WL 942559 at *7 (Mass.Super.Ct. June 27, 2000) (Gants, J.). See also Campanile v. Suffolk Constr. Co., 1994 WL 879741 at *3 (Mass.Super.Ct. Feb. 4, 1994) (Fremont-Smith, J.) (1 Mass. L. Rptr. 486) (rejecting proposition that a condominium association’s awareness of one defect puts them on notice of all construction defects in the building). Accordingly, each type of defect must be analyzed separately, keeping in mind that “notice of one problem that may result from a design or construction defect may provide notice as to another problem likely to emanate from the same design or construction defect.” Harris v. McIntyre, 2000 WL 942559 at *7.

1. Building Wrap

The Trustees claim that the defendants breached the warranty of habitability and were negligent by failing to provide a weather-resistant membrane on buildings 1, 2, 3, 4 and 7, and by the existence of gaps in the building wrap on buildings 8 and 9. According to Burton Kaplan, who served as the managing trustee of the Board of Trustees from 7/84 to 7/86 and as president of the ad hoc owner’s committee from 1984-1985, the lack of a weather-resistant membrane first manifested itself to the trustees in 1986-1987. However, this defect was not asserted in the First Amended Complaint filed on February 25, 1987, the Second Amended Complaint filed on September 22, 1987, or the Third Amended Complaint filed on October 26, 1988, nor was it addressed in the Master’s Report following the first trial.
Given the failure to raise the lack of a weather-resistant membrane as a specific defect for which damages were sought until the second trial on January 10, 2005, any claim based on this defect is time-barred. Alternatively, the Trustees have waived their right to recover for the weather-resistant membrane as an independent defect by failing to assert it during the first trial. See Gram v. Liberty Mut. Ins. Co., 391 Mass. 333, 335 (1984); M.B. Claff, Inc. v. Massachusetts Bay Transp. Auth., 59 Mass.App.Ct. 669, 677-78 & n.9 (2003).
2. Lack of Flashing in Windows
The Trustees contend that the defendants’ failure to flash any of the windows breached the warranty of habitability and constituted negligence. Where there are widespread water leaks in a newly constructed building, the plaintiffs should reasonably know that such leaks are almost certainly the result of design or construction defects. White v. Peabody Constr. Co., Inc., 386 Mass. at 130. See also Beaconsfield Townhouse Condo. Trust v. Zussman, 49 Mass.App.Ct. 757, 762, rev. den., 432 Mass. 1109 (2000). In the winter of 1983, Kaplan observed that the windows in his unit got a lot of air filtration. In spring and summer of 1984, Kaplan observed that he was able to probe from the window frames in his unit right through to the interior of the wall and that his windows had no flashing. The other Trustees knew about the lack of flashing condition by July of 1984. In July of 1984, the unit owners formed the Cotuit Bay Condo Owners Association to deal with problems regarding water damage to units and structural defects. Between late 1985 and early 1987, the Board of Trustees investigated whether there was flashing in other windows. Kaplan, as managing trustee, examined all the windows in the other units and did not observe any flashing. The Trustees collectively had knowledge of the leaking windows in July of 1984, when Kaplan joined the Board, causing the statute of limitations to accrue at that time. The plaintiffs’ claims for this defect are thus timely.
Even if notice of other leaks, such as skylights and slider doors, should have placed the Board ofTrustees on notice of a possible lack of flashing around the windows, the plaintiffs’ claims are timely. The defendants argue that because Stuart Bomstein had notice *538 of the leaking skylights and sliders in 1983 based on owner complaints, the statute of limitations began to run at that time, making the plaintiffs’ complaint in January of 1987 untimely. However, the general rule is that when an agent has an interest adverse to his principal, notice to the agent does not constitute notice to the principal. See GTE Products Corp. v. Broadway Electrical Supply Co., Inc., 42 Mass.App.Ct. 293, 299-300 (1997). See also Am.Jur.2d Corporations §1451 (2004). Bomstein’s knowledge therefore should not be imputed to the Board, given his adverse interest. Trustee Anthi Tsamtsouris observed leaks in her own slider doors and skylights in spring of 1984, and Kaplan was aware of slider leaks in his own unit when he joined the Board in July of 1984. Assuming that this was sufficient notice to the Board of all leaking problems, including the lack of flashing, the statute of limitations began to run in mid-1984, and the plaintiffs’ complaint on January 27, 1987 was timely.

3.Bathroom Ventilation

The Trustees allege that the bathrooms in many units were improperly ventilated, breaching the warranty of habitability and constituting negligence. In 1984, Kaplan observed that the bathroom exhausts in unit 23 were not vented to the exterior but vented in the attic. In 1984 and 1985, as managing trustee, Kaplan observed that the bathrooms in other units vented into the attics, and this was visible to the naked eye. Kaplan became a member of the Board of Trustees in July of 1984, and if his knowledge as managing trustee is imputed to the rest of the Board, the statute of limitations began to run at that time. Accordingly, the plaintiffs’ claims for improper bathroom ventilation were timely filed in January of 1987.

4.Attic Ventilation

The Trustees allege that the attics of many condominiums were improperly ventilated, breaching the warranty of habitability and constituting negligence. In 1984 and 1985, as managing trustee, Kaplan went onto the roof and observed that there were no ridge vents. Based on Kaplan’s knowledge, the Board of Trustees had notice of this defect in June of 1984 and the statute of limitations began to run at that time. The plaintiffs’ claims for improper attic ventilation were thus timely filed.

5.Firewalls

The Trustees allege that the fire separation walls were inadequate, breaching the warranty of habitability and constituting negligence. In 1984 and 1985, as managing trustee, Kaplan went into the attic and observed with the naked eye that there were a number of instances of firewall defects where the sheetrock was not properly taped and compounded. The other Trustees first became aware of the inadequate firewalls in 1987 as a result of the LEA report. Even using 1984 as the accrual date, the plaintiffs’ claims for inadequate firewalls are timely.

6.Firestops

The Trustees allege that the defendants provided inadequate firestops in all of the C-style units, breaching the warranty of habitability and constituting negligence. The Trustees first became aware of inadequate fire stopping between floors in early 1987 from the LEA report. The statute of limitations for the claims concerning inadequate fire stops began to run at that time, and are therefore timely.

7.Chimney Fastening

The Trustees allege that all of the chimneys at the condominium were improperly fastened, breaching the warranty of habitability and constituting negligence. Two chimneys fell off during Hurricane Gloria in 1985, and Kaplan went up on the roof and observed that the chimneys had been connected to the roof only by 2x4s nailed to the roof sheathing. Kaplan also went into the attics of some units and was able to see that their chimneys were connected the same way. The Board of Trustees, through Kaplan, had notice of the defective chimney fastening in 1985, making the complaint filed on January 28, 1987 timely as to these claims.

8.Chimney Clearance and Framing

The Trustees allege that 11 chimneys at the condominium were improperly framed and 3 chimneys were of insufficient height, breaching the warranty of habitability and constituting negligence. The Trustees first learned of problems with chimney framing and chimney clearance in early 1987. However, these defects were not asserted in the First Amended Complaint filed on February 25, 1987, the Second Amended Complaint filed on September 22, 1987, or the Third Amended Complaint filed on October 26, 1988, nor were they addressed at the first trial. Given the failure to seek damages for the specific defects of chimney clearance and framing until the second trial on January 10, 2005, any negligence or breach of implied warranty of habitability claim based on these defects is time-barred. Alternatively, the Trustees have waived their right to recover for these conditions as independent defects by failing to introduce any evidence on those issues at the first trial. See Gram v. Liberty Mut Ins. Co., 391 Mass. at 335; M.B. Claff, Inc. v. Massachusetts Bay Transp. Auth., 59 Mass.App.Ct. at 677-78 & n.9.

9.Cut-in decks

The Trustees allege that all of the cut-in decks at the condominium leaked, breaching the warranty of habitability and constituting negligence. In 1985, Kaplan observed drywall hanging in the kitchen area beneath the cut-out deck in unit 2. In 1985 or 1986, Kaplan observed drywall hanging and staining in the kitchen and foyer ceilings beneath the cut-in deck in unit 13. Kaplan noticed that the deck was slanted toward the house, causing water to accumulate. It was obvious to the naked eye, using a ladder and a tape measure, that the pitch of the decks in unit 5 and unit *539 19 was incorrect. The other trustees first learned of a problem with the cut-in decks in mid-1986. Based on Kaplan’s knowledge as the managing trustee, the Board of Trustees had notice of this defect some time in 1985 and the statute of limitations began to run at that time. The plaintiffs’ claims for this defect are therefore timely.
Thus, with the exception of the claims for lack of building wrap and improper chimney clearance and framing, the defendants’ statute of limitations defense must fail.

II. IMPLIED WARRANTY OF HABITABILITY

Count X of the Trustees’ third amended complaint alleges breach of the implied warranty of habitability. An implied warranty of habitability attaches to the sale of new homes and residential condominium units by builder-vendors in Massachusetts. Berish v. Bomstein, 437 Mass. 252, 263 (2002); Albrecht v. Clifford, 436 Mass. 706, 711 (2002). This warranty protects purchasers from structural defects that are nearly impossible to ascertain by inspection after the home is built, and imposes the burden of repairing latent defects on the person with the opportunity to notice, avoid, or correct ■them during the construction process. Albrecht v. Clifford, 436 Mass. at 710. A home that is unsafe because it deviates from fundamental aspects of the applicable building codes or fails to keep out the elements because of defects in construction breaches the implied warranty of habitability. Id. at 711. However, the implied warranty “does not make the builder an insurer against any and all defects in a home, impose on the builder an obligation to deliver a perfect house, or protect against mere defects in workmanship, minor or procedural violations of the applicable building codes, or defects that are trivial or aesthetic.” Id

A. Assigned Claims of Individual Unit Owners

The Trustees assert a breach of habitability caused by inadequate headroom clearance in the staircases in Units 26, 59, 61, 82 and 88 pursuant to assignments from the individual owners of those units. The headroom clearance on each of these staircases was several inches shorter than the applicable building code requirement of 6’8" minimum headroom. The owner of a condominium unit may bring a claim for breach of the implied warranty of habitability by establishing (1) that he purchased a new residential condominium unit from the builder-vendor, (2) the condominium unit contained a latent defect, (3) the defect manifested itself to the purchaser only after the unit’s purchase, (4) the defect was caused by the builder’s improper design, material, or workmanship, and (5) the defect created a substantial question of safety or made the condominium unfit for human habitation. Berish v. Bornstein, 437 Mass. at 264. The unit owner must bring such a claim within the three-year statute of limitations and the six-year statute of repose set forth at G.L.c. 260, §2B. Id at 264; Albrecht v. Clifford 436 Mass. at 712.
Accrual of the three-year statute of limitations depends on the knowledge of the individual unit owner as to a particular defect. See Berish v. Bomstein, 437 Mass. at 264 n.25. The problem of inadequate staircase headroom was first brought to the attention of trustees in late 1984, presumably by the individual unit owners, at least one of whom hit his head, requiring his head to be bandaged. However, the Trustees failed to file a claim based on the lack of headroom clearance in the First Amended Complaint filed on February 25, 1987, the Second Amended Complaint filed on September 22, 1987, or the Third Amended Complaint filed on October 26, 1988. Rather, they asserted this particular defect for the first time during the second trial on January 10, 2005. Accordingly, a breach of implied warranty of habitability claim seeking damages for inadequate headroom clearance in individual units is time-barred.[11]
Moreover, even if this claim were not time-barred, the Trustees would not be entitled to recover for breach of the warranty of habitability because the inadequate headroom clearance was not latent. A latent defect is a condition which is hidden or concealed and not discoverable by reasonable and customary observation or inspection once construction is complete. Albrecht v. Clifford 436 Mass. at 710, 713. Here, the lack of adequate clearance was readily observable by the unit owners, one of whom actually hit his head, requiring his head to be bandaged. Accordingly, the inadequate headroom was not a latent defect for purposes of the implied warranty of habitability.
Further, not every minor or isolated violation of the building or sanitary codes constitutes a breach of the warranty of habitability. McAllister v. Boston Housing Auth., 429 Mass. 300, 305 (1999); Jablonski v. Clemons, 60 Mass.App.Ct. 473, 475 (2004); McKenna v. Begin, 5 Mass.App.Ct. 304, 308 (1977). The courtis given broad discretion to determine whether defects in a residence constitute a material breach of the warranty justifying an award of damages. Boston Housing Auth. v. Hemingway, 363 Mass. 184, 200-01 n.16 (1973); Jablonski v. Clemons, 60 Mass.App.Ct. at 475; McKenna v. Begin, 5 Mass.App.Ct. at 308. Regardless of whether the requirements of the building code were violated, the inadequate headroom clearance neither created a substantial question of safety nor made the condominium units unfit for human habitation.
For all these reasons, the Trustees are not entitled to recover for breach of the warranty of habitability based on inadequate headroom clearance in the staircases in Units 26, 59, 61, 82 and 88.[12]

B. Common Area Claims

The remaining claims in this case relate to defects in the common areas of the condominium. “Only the Trustees have the right to conduct litigation concerning common areas and facilities.” Cigal v. Leader Dev. Corp., 408 Mass. 212, 215 (1990). To establish abreach of the implied warranty of habitability in a common area of the condominium, the organization of unit owners must *540 show that (1) it is an organization of unit owners as defined by G.L.c. 183A, §1; (2) the common area of the condominium development contains a latent defect; (3) the latent defect manifested itself after construction of the common area was substantially completed; (4) the defect was caused by the builder’s improper design material or workmanship; and (5) the defect created a substantial question of safety as to one or more individual units or made such units unfit for human habitation. Berish v. Bornstein, 437 Mass. at 266.

1.Building Wrap

As discussed supra, any claim that the failure to provide weather-resistant membrane on buildings 1,2,3,4 and 7, and the existence of gaps in the building wrap on buildings 8 and 9 breached the warranty of habitability is time-barred under G.L.c. 260, §2B. This Court therefore need not discuss the merits of such a claim.

2.Windows

The Trustees contend that the defendants’ failure to flash or caulk any of the windows breached the warranty of habitability. “Keeping out rain and cold is the most fundamental function of housing ...” Kingston Housing Auth. v. Sandonato & Bogue, Inc., 31 Mass.App.Ct. 270, 271 (1991). A home that fails to keep out the elements because of defects in construction breaches the implied warranty of habitability. Albrecht v. Clifford, 436 Mass. at 711. Nonetheless, this Court concludes that the lack of flashing was not a latent defect because Kaplan was able to observe, without destructive testing, that there was no flashing on the windows. A latent defect is a condition which is hidden or concealed and not discoverable by reasonable and customary observation or inspection once construction is complete. Id. at 710,713. In discussing the rationale for the warranty of habitability, the Supreme Judicial Court expressed concern with defects which are “nearly impossible to ascertain by inspection after the home is built.” See id. at 710.
Here, Kaplan, an ordinary purchaser with no construction expertise, felt a lot of air penetration through his windows and observed that he could probe from the window frames right through to the interior of the wall because there was no flashing. He did not have to remove any shingles from the exterior of the unit or perform any other destructive testing to determine that there was no flashing. Thus, the lack of flashing was a condition which was capable of discovery by reasonable observation following the completion of construction. Cf. Albrecht v. Clifford, 436 Mass. at 715 (declining to decide whether defects in fireplaces, chimneys and flues were latent but describing the issue as “close” where a mason was able to determine that they violated the building code by making observations and taking measurements of the materials and components that were readily accessible). Accordingly, the Trustees cannot recover for breach of the warranty of habitability based on the inadequately flashed windows.

3.Bathroom Ventilation

The Trustees contend that the venting of the bathrooms into the attic or into the space between the ceiling and the floor breached the warranty of habitability. The improper bathroom ventilation was a latent defect which was hidden or concealed and not discoverable by reasonable and customary observation or inspection once construction was complete. See Albrecht v. Clifford, 436 Mass, at 710, 713. The LEA Group identified the improper venting based on a mere visual review of the unfinished attics. However, a condominium owner would not suspect that the ventilation violated the building code from mere observation of the bathroom. See Overton v. Kirtgsbrooke Development, Inc., 788 N.E.2d 1212, 1218 (Ill.App. 5 Dist.), rev. den., 803 N.E.2d 485 (Ill. 2003) (for purposes of warranty of habitability, defect is latent if not discovered by exercise of care by ordinary owners without expertise in home building); Tyus v. Resta, 476 A.2d 427, 433 (Pa.Super. 1984) (for purposes of warranty of habitability, defect is latent if not discoverable by reasonable inspection by intended purchaser, not an expert). Cf. Albrecht v. Clifford, 436 Mass. at 715 (declining to decide whether defects in fireplaces, chimneys and flues were latent but describing the issue as “close” where a mason was able to determine that they violated the building code by making observations and taking measurements of the materials and components that were readily accessible). Thus, the bathroom ventilation system was a latent defect, and one which manifested itself after the condominium construction was substantially complete.
Further, the bathroom ventilation system contained a construction or design defect because it failed to comply with the 1980 State Building Code. Nonetheless, the improper system neither created a substantial question of safety nor made the units unfit for human habitation. As discussed supra, the Trustees did not prove that the improper bathroom ventilation resulted in the collection of moisture and eventual decay of wooden rafters and sheathing in the attic, or that it resulted in significant mold growth in 31 condominium units. The implied warranty of habitability does not make the builder an insurer against any and all defects in a home. Albrecht v. Clifford, 436 Mass. at 711. Not eveiy violation of the building or sanitary codes constitutes a breach of the warranty of habitability. McAllister v. Boston Housing Auth., 429 Mass. at 305; Jablonski v. Clemons, 60 Mass.App.Ct. at 475. This Court concludes that the improper bathroom ventilation does not constitute a material breach of the warranty justifying an award of damages. See Boston Housing Auth. v. Hemingway, 363 Mass. at 200-201 n.16 (1973); Jablonski v. Clemons, 60 Mass.App.Ct. at 475.

4.Attic Ventilation

The Trustees allege that the attics of many condominium units were improperly ventilated without ridge vents or baffles in breach of the warranty of habitability. The defendants contend that the improper attic venting was *541 not a latent defect because the LEA Group was able to observe the absence of ridge vents without the need for destructive testing such as the removal of roof shingles. However, a condominium owner would not suspect that the attic ventilation violated the building code from mere observation, without gaining access to the roof by ladder or using binoculars. With respect to the 18 units without attics, one would have to climb a ladder and remove the soffit vent by cutting the soffit board in order to observe the absence of eave vents. Accordingly, the improper attic ventilation was a latent defect. See Albrecht v. Clifford, 436 Mass. at 710, 713. This defect manifested itself after the condominium construction was substantially complete.
Further, the attic ventilation system contained a construction or design defect because it violated section 2121.1 and 507.2.4 of the 1980 Code. This defect was caused by the defendants’ improper design or workmanship.
Nonetheless, the improper attic ventilation neither created a substantial question of safety nor made the units unfit for human habitation. As discussed supra, the Trustees failed to prove that the improper attic ventilation will eventually lead to decay of the timbers, rafters and plywood in the attic and roof, that it substantially contributed to the premature failure of the roofs, or that it resulted in significant mold growth in 31 condominium units. The implied warranty of habitability does not make the builder an insurer against any and all defects in a home. Albrecht v. Clifford, 436 Mass. at 711. Not every violation of the building or sanitary codes constitutes a breach of the warranty of habitability. McAllister v. Boston Housing Auth., 429 Mass. at 305; Jablonski v. Clemons, 60 Mass.App.Ct. at 475. This Court concludes that the improper attic ventilation does not constitute a material breach of the warranty justifying an award of damages. See Boston Housing Auth. v. Hemingway, 363 Mass. at 200-01 n.16 (1973); Jablonski v. Clemons, 60 Mass.App.Ct. at 475.

5.Fire walls

The Trustees contend that inadequate fire walls between units violated the warranty of habitability. The defendants argue that this defect was not latent because inspectors were able to ascertain the code violations by observations in the attic that did not require destructive testing. However, these observations were possible only after accessing the attics through narrow and unstable pull-down ladders and crossing the ceiling joists. Under these circumstances, the fire walls were a latent defect. See Albrecht v. Clifford, 436 Mass. at 710, 713. Moreover, this defect manifested itself after the condominium construction was substantially complete.
The failure to tape and compound walls between units, the leaving of incomplete walls between units, and the use of gypsum wallboard less than 5/8" thick violated sections 909.1.2 and 909.4 of the 1980 Building Code. The inadequate fire walls, which did not obtain the requisite one-hour fire resistance rating, were a defect caused by the defendants’ improper design or workmanship. Finally, the inadequate fire separation walls created a substantial question of safety as to one or more individual units in the condominium and therefore, constituted a breach of the warranty of habitability. See Berish v. Bomstein, 437 Mass. at 266.

6.Fire stops

The Trustees contend that the failure to provide adequate fire stops in the C-style units breached the warranty of habitability. The defendants contend that this defect was not latent because inspectors were able to ascertain the code violations by observations in the attic that did not require destructive testing. However, these observations were possible only after accessing the attics through narrow and unstable pull-down ladders, crossing the ceiling joists, moving some ducts and sticking their heads down the chimney. Under these circumstances, the inadequate fire stops were a latent defect. See Albrecht v. Clifford, 436 Mass. at 710, 713. Moreover, this defect manifested itself after the condominium construction was substantially complete.
The lack of fire stops in the chimney vents violated sections 919.6.4 and 2103.2.7 of the 1980 Code. The inadequate fire stops, which could allow smoke and flames to travel and spread quickly to other areas of the unit, were a defect caused by the defendants’ improper design or workmanship. Finally, the inadequate fire stops created a substantial question of safety as to one or more individual units in the condominium and therefore, constituted a breach of the warranty of habitability. See Berish v. Bomstein, 437 Mass, at 266.

7.Chimney Fastening

The Trustees contend that the attachment of chimneys by nailing 2-by-4 frames to plywood sheathing with 16-penny nails breached the warranty of habitability. The defendants argue that the defect in chimney fastening was not latent because the method of attachment was readily observable from the roof or inside the attic. However, without removing a section of each chimney, it was impossible to tell whether there was adhesive or bracing on the inside of the framing to help connect the chimney. Under these circumstances, the inadequate chimney fastening was a latent defect. See Albrecht v. Clifford 436 Mass. at 710, 713. Moreover, this defect manifested itself after the condominium construction was substantially complete.
The method of chimney fastening utilized by the defendants violated section 715 of the 1980 Building Code and was a defect caused by the defendants’ improper design or workmanship. Nonetheless, this Court concludes that the inadequate chimney fastening did not create a substantial question of safety or make the units unfit for human habitation. Admittedly, one chimney blew off during Hurricane Gloria and nine more blew off during Hurricane Bob. However, any safely concern relates not so much to the individual occupants of the units as to the general *542 public outside. Under this odd circumstance, the Trustees are not entitled to recover for this defect under a warranty of habitability theory.

8. Chimney Clearance and Framing

As discussed supra, the Trustees first learned of problems with chimney framing and chimney clearance in early 1987. However, the Trustees failed to assert a claim based on these defects in the First Amended Complaint filed on February 25, 1987, the Second Amended Complaint filed on September 22, 1987, or the Third Amended Complaint filed on October 26, 1988. Given the failure to assert chimney clearance and framing as specific defects for which damages were sought until the second trial on January 10, 2005, a breach of implied warranty of habitability claim based on these defects is time-barred.

III. NEGLIGENCE

Count I of the Third Amended Complaint alleges negligence on the part of Bomstein individually and as tmstee of the Cotuit Bay Condominium Tmst based on his failure to exercise due care in the design and construction of the condominium so that such would be free from defects and deficiencies. The Trustees allege that they will be required, at substantial expense, to correct said defects and deficiencies. Count II asserts a claim of negligence against Cotuit Bay Condominium, Inc.
In order to prevail on a claim of negligence, the Trustees must demonstrate that the defendants breached a duly to use reasonable care, that the Tmstees suffered an actual loss, and that this loss was caused by the defendants’ negligence. Glidden v. Maglio, 430 Mass. 694, 696 (2000).

1.Building Wrap

As discussed supra, a negligence claim based on the failure to provide weather-resistant membrane on buildings 1, 2, 3, 4 and 7, and the existence of gaps in the building wrap on buildings 8 and 9 is time-barred under G.L.c. 260, §2B. This Court therefore need not discuss the merits of such a claim.

2.Windows

The Trustees have established that the defendants failed to use reasonable care in installing the windows. The failure to flash or caulk the windows to make them waterproof fell below industry standards. See Corthell v. Great Atl. & Pac. Tea Co., 291 Mass. 242, 243-44 (1935); Bergendahl v. Massachusetts Elec. Co., 45 Mass.App.Ct. 715, 719 (1998), rev. den., 707 N.E.2d 1078, cert. den., 528 U.S. 929 (1999) (industry standards and practice are relevant to assessing reasonable care). There is no merit to the defendants’ assertion that the Trustees failed to eliminate other causes for the many window leaks in the condominium. A plaintiff is not bound to exclude every other possible cause for his injury other than the defendant’s negligence, but must show a greater likelihood that it came from an act of negligence for which the defendant is responsible than from a cause for which the defendant is not responsible. Forlano v. Hughes, 393 Mass. 502, 507 (1984). The Trustees established that the lack of flashing and caulking was a substantial contributing cause of the leaking windows. Accordingly, the Trustees are entitled to recover in negligence for the leaking windows.[13]

3.Bathroom Ventilation

The Trustees have established that the defendants failed to use reasonable care in the design and construction of the bathroom ventilation system, which failed to comply with the 1980 Code. Although a violation of the building code is not conclusive on the issue of liability, it is some evidence of negligence. McAllister v. Boston Housing Auth., 429 Mass. 300, 305 (1999):
However, the defendants contend that the Trustees are barred by the economic loss doctrine from recovering in negligence for the improper bathroom ventilation. Purely economic losses[14] are not recoverable in tort, in the absence of personal injury or physical damage to property other than the defective product itself. Berish v. Bornstein, 437 Mass, at 267; Aldrich v. ADD, Inc., 437 Mass. 213, 222 (2002). To recover under a theory of negligence, the plaintiffs must demonstrate “property damage beyond the defects in the condominium units themselves.” Berish v. Bornstein, 437 Mass. at 268. Cf. Aldrich v. ADD, Inc., 437 Mass. at 222-23 (economic loss doctrine did not bar recovery against negligent architect where negligent design caused physical damage to the common areas of a condominium and to cars parked in a leaking garage). The defendants contend that the Trustees’ negligence claim is barred because the only alleged damage caused by the improper bathroom ventilation is mold contamination and future decay of the rafters and sheathing. As discussed supra, the Trustees failed to prove by a preponderance of the credible evidence that the improper ventilation resulted in significant mold growth in 31 condominium units. In addition, the Trustees failed to prove that the improper ventilation system will cause decay of the rafters and sheathing. In any event, the mere possibility of future personal injury or property damage is insufficient property damage to avoid the economic loss doctrine and permit recovery in negligence. See Sebago, Inc. v. Beazer East, Inc., 18 F.Sup.2d 70, 94-95 (D.Mass. 1998) (economic loss doctrine barred owner’s negligence claim for defective roof where only damages were to building itself and tenant’s property). Given the lack of proof of property damage beyond the defective ventilation system itself, the Trustees’ negligence claim must fail.

4.Attic ventilation

The Trustees have established that the defendants failed to use reasonable care'in the design and construction of the attic ventilation system. The failure to construct ridge vents or baffles in the attic violated section. 2121.1 and 507.2.4 of the 1980 Code. See McAllister v. Boston Housing Auth., 429 Mass. at 305 (violation of the building code is some evidence of negligence).
*543 Again, however, the defendants contend that the Trustees are barred by the economic loss doctrine from recovering in negligence for the improper attic ventilation. To recover under a theory of negligence, the plaintiffs must demonstrate “property damage beyond the defects in the condominium units themselves.” Berish v. Bornstein, 437 Mass. at 268. The damage alleged by the Trustees is mold contamination and premature roof failure. As discussed supra, the Trustees failed to prove by a preponderance of the credible evidence that improper attic ventilation substantially contributed to either mold growth or the premature failure of the roofs. That the inadequate ventilation might eventually lead to decay of the timbers, rafters and plywood in the attic and roof, was not proven and in any event, is insufficient to avoid application of the economic loss doctrine. See Sebago, Inc. v. Beazer East, Inc., 18 F.Sup.2d at 94-95. Thus, the Trustees cannot recover in negligence for the improper attic ventilation.

5.Fire walls and Fire stops

The Trustees have established that the defendants failed to use reasonable care in the design and construction of the fire walls and fire stops. The fire walls failed to comply with 909.1.2 and 909.4 of the 1980 Code, and the fire stops failed to comply with sections 919.6.4 and 2103.2.7 of the 1980 Code. See McAllister v. Boston Housing Auth., 429 Mass. at 305. Nonetheless, despite the serious safety threat posed by these defects, the Trustees are barred from a negligence recovery by the economic loss doctriné because they have failed to demonstrate property damage beyond the defects in the condominium units themselves. See Berish v. Bomstein, 437 Mass. at 268.

6.Chimney Connections

The Trustees have established that the defendants failed to use reasonable care in the attachment of chimneys by nailing 2-by-4 frames to plywood sheathing with 16-penny nails. This method violated section 715 of the 1980 Building Code. See McAllister v. Boston Housing Auth., 429 Mass. at 305 (violation of the building code is some evidence of negligence). Again, however, the Trustees are barred from recoveiy by the economic loss doctrine, as they have failed to demonstrate that the improper chimney fastening caused personal injury or physical damage to properly other than the defective chimneys themselves. See Berish v. Bomstein, 437 Mass. at 268.

7.Cut-in Decks

Finally, the Trustees did not establish by a preponderance of the evidence that the defendants failed to use reasonable care in designing and constructing the cut-in decks in 15 units at the condominium. Despite the lack of expert testimony concerning the cut-in decks, the Trustees argue that this Court may find negligence by applying the doctrine of res ipsa loquitur. That doctrine permits the trier of fact to draw an inference of negligence in the absence of a finding of a specific cause of the occurrence, where the accident is of the type or kind that ordinarily would not happen unless the defendant was negligent in some respect and other responsible causes, including the conduct of the plaintiff, are sufficiently eliminated by the evidence. See Enrich v. Windmere Corp., 416 Mass. 83, 88 (1993); Wilson v. Honeywell, Inc., 409 Mass. 803, 805-06 (1991). The mere occurrence of the leaking of water into a condominium unit in the area of a cut-in deck is not the sort of event which shows negligence as a cause, permitting the application of the res ipsa loquitur doctrine. In light of the lack of expert testimony regarding the design and construction of the cut-in decks, the Trustees have failed to establish negligence on the part of the defendants.

IV. DAMAGES

To summarize, the Trustees are entitled to recover damages for the defective fire walls and the lack of proper fire stops based on a theory of breach of the implied warranty of habitability. The Trustees are further entitled to recover in negligence for the leaking windows. Unfortunately, this Court is precluded from awarding damages for numerous other defects in the Cotuit Bay Condominiums, residences that the defendants advertised as “luxury” condominiums, but which were in reality shoddily constructed and substandard in many respects.
When the damage to properly is reasonably curable by repair, the expense of such repairs is an appropriate measure of recoveiy. Massachusetts Port Auth. v. Sciaba Constr. Corp., 54 Mass.App.Ct. 509, 516, rev. den., 437 Mass. 1104 (2002); Black v. Coastal Oil New England, Inc., 45 Mass.App.Ct. 461, 465, rev. den., 707 N.E.2d 1077 (1998). The cost of repairs must be reasonable and the repairs must be reasonably necessary in light of damage inflicted by the defendant. Massachusetts Port Auth. v. Sciaba Constr. Corp., 54 Mass.App.Ct. at 516. The plaintiff should not receive a windfall by recovering more than is fair to restore him to his position prior to the loss. Id. at 517.
The cost of repairs may be valued as of the time of trial, rather than as of the time of breach, and current cost of repair estimates are evidence of the extent of earlier damage. Willow Springs Condominium Assoc., Inc. v. Seventh BRT Develop. Corp., 717 A.2d 77, 108 (Conn. 1998). See also Brunner & O’Connor, Construction Law § 19:58, at 215 (2002). Here, the Trustees did not unreasonably delay in making the necessary repairs; rather, the lapse of time has resulted from this protracted litigation, which has increased significantly the reasonable costs of repair. In accordance with the credible expert testimony, the Trustees are entitled to damages in the amount of $358,274.62 for the reasonable repair of the leaking windows, $123,404 for the reasonable repair of the fire walls, and $65,092 for the reasonable installation of proper fire stops.[15]

*544
ORDER FOR JUDGMENT

For the foregoing reasons, it is hereby ORDERED that judgment enter in favor of plaintiffs Stephen Berish, Rita Reisner, Anthi Tsamtsouris, Sidney Parlow, Irving Lyon and Angelo Massa as they are the Trustees of the Trust of the Cotuit Bay Condominium against defendants Stuart Bornstein, individually and as Trustee of the Cotuit Bay Condominium and Cotuit Bay Condominium, Inc. on Counts I and II of the Third Amended Complaint in the amount of three hundred and fifty-eight thousand, two hundred and seventy-four dollars and sixty-two cents ($358,274.62)
It is further ORDERED that judgment enter in favor of plaintiffs Stephen Berish, Rita Reisner, Anthi Tsamtsouris, Sidney Parlow, Irving Lyon and Angelo Massa as they are the Trustees of the Trust of the Cotuit Bay Condominium against defendant Stuart Bornstein, individually and as Trustee of the Cotuit Bay Condominium on Count X of the Third Amended Complaint in the amount of one hundred and eighty-eight thousand, four hundred and ninety-six dollars and no cents ($188,496.00)

Units 1, 10, 12, 16, 18, 19, 62, 65, 73, 74, 77 and 81.

Units 1, 2, 5, 6, 8, 9, 10, 11, 12, 13, 15, 16, 17, 18, 21, 24, 26, 31, 58, 60, 61, 62, 63, 65, 66, 67, 68, 73, 74, 76, 77, 79, 81, 83, 85, 88 and 88. (Master’s Finding 188). In all cases where water leaked from the structured components of the units, namely from the chimney enclosures, roofs, skylights, sliders, interior damage to sheet rock and other interior elements was caused. (Master’s Finding 190.)

Those units actually experiencing water leaks at the sliders were: 5, 8, 9, 15, 16, 17, 18, 22, 23, 24, 25, 26, 27, 29, 65, 71, 74, 76, 77, 80, 81, 82, 84, 85 and 86. These leaks appeared immediately or shortly after occupancy.

In the Master’s Report at page five, it stated that the category under fire wall recovery was stricken from the trust’s claim. A review of the transcript from the Master’s hearing regarding this issue:
On page 44, under date December 20th, 1994 on Une three, Mr. Henchy: “I had conceded on a couple of the items with regard to item number one, future repairs. Subject to previous ... I have stipulated that evidence regarding future repair work of fire walls ... go out.”
On page 45, line four, Mr. Henchy: “I think I had also agreed, subject to my objections to your prior rulings, as to the future work necessary to correct fire walls.”
On page 47, Une 23, Attorney Roberts: “My next question is we cannot agree here, there was no evidence as to the reasonable necessity or the fair and reasonable value of repairs to . . . fire walls.
On page 48, Une 20, Attorney Roberts: “In the text of the first paragraph, it describes the four areas that are missing that testimony. Line 23, the Master, the skylights, the rubber roofs, the foundation cracks and the fire walls.”
On page 49, line 1, Attorney Roberts: “I think the plaintiffs, I think they have to agree with that; there is no such testimony. Line 7, the Master, fire wafis, they have agreed on.”
On page 51, line 21, the Master: “I will make it easy. I think that I’m prepared on the motion to strike to rule that evidence of the reasonably necessary repairs ... well, I think that I want to say is that evidence regarding future repairs of the skylights, the rubber roofs, foundation cracks, and fire walls, is excluded.”
This Court is mindful of the defendant’s position that the Trustees should not be given two bites at the apple" with respect to the fire walls and fire stops. However, the Master did not award any damages for these defects, and regardless of whether the Trustees agreed to forego recovery in front of the Master for breach of fiduciary duly, they may recover for breach of the warranty of habitabfiify and negligence.

According to Kaplan, prior to October of 1983, the Board was comprised of Bornstein, his relatives (Morris, Paul and JamiUa Bornstein) and his project manager, Ronald Schmidt. Beginning in July of 1983, the Board was comprised of the four Bomsteins plus unit owner Dr. Tsamtsouris. (Tr. 1/11 at 59.) Beginning in July of 1984, the Board was comprised of Stuart, JamiUa and Paul Bornstein, and unit owners Tsamtsouris and Kaplan. (Tr. 1/11 at 60.) In July of 1985, Irving Lyon was appointed a successor trustee. (Tr. 1/11 at 60.) Stuart Bornstein was the Chairman of the Board until July of 1985. (Tr. 1/12 at p. 266.)

At least two Superior Court decisions have addressed this issue. See Arthaud v. Brignati, 10 Mass. L. Rptr. No. 18, 405 n.4 (October 11, 1999) (McDonald, J.) (declining to apply the adverse domination doctrine to a condominium board of trustees in a defective construction case), and Harris v. McIntyre, 2000 WL 942559 at *4-5 (Mass.Super. June 27, 2000) (Gants, J.) (acknowledging plaintiffs’ argument that the statute of limitations was toUed whUe the developer dominated the board, but concluding that it could not be asserted against an independent construction company).

This Court notes that individual unit owners have an alternative path of redress by filing a derivative action in accordance with Mass.R.Civ.P. 23.1 where a condominium association fails or refuses to pursue a wrong against that association. See Cipal v. Leader Development Corp., 408 Mass. at 218 n.10; Cote v. Levine, 52 Mass.App.Ct. 435, 429 (2001).

 In the alternative, the Trustees have waived their right to recover for inadequate headroom clearance as an independent defect by failing to introduce any evidence on that issue at the first trial. See Gram v. Liberty Mut Ins. Co., 391 Mass. at 335; M.D. Claff, Inc. v. Massachusetts Bay Transp. Auth., 59 Mass.App.Ct. at 677-78 & n.9.

This Court need not address whether the claim for breach of the warranty of habitability based on inadequate headroom clearance must also fail because the owners of four of the five units at issue are not original owners. See Albrecht v. Clifford, 436 Mass. at 711 n.9 (court not called upon to decide whether subsequent purchasers can state claim against builder for breach of implied warranty).

The Trustees do not appear to argue that such recovery is barred by the economic loss doctrine. In Berish, the Supreme Judicial Court suggested that water damage to individual units would constitute sufficient property damage to avoid application of the economic loss doctrine. See Berish v. Bornstein, 437 Mass. at 268.

Economic loss includes damages for inadequate value, costs of repair or replacement of a defective product, and loss of profits. Berish v. Bornstein, 437 Mass. at 267.

This Court finds that the defendants have not proved the Trustees’ failure to mitigate damages. A plaintiff is not entitled to recover for damages that were avoidable by the use of reasonable precautions on his part. Burnham v. Mark IV Homes, Inc., 387 Mass. 575, 586 (1982). However, the defendant bears the burden of proof on mitigation. McKenna v. Commissioner of Mental Health, 347 Mass. 674, 677 (1964).